253 F.3d 423 (9th Cir. 2001)
 ALFRED RONCONI; JAMES V. BIGLAN; JEAN MULLIN, PLAINTIFFS-APPELLANTS,
v.
C. RAYMOND LARKIN, JR.; LAUREEN DEBUONO; DAVID B. SWEDLOW; MICHAEL P. DOWNEY; KENNETH E. BENNERT; ROBERT L. DOYLE; LEE MIDDLEMAN; BOUDEWIJN L. BOLLEN; CHARLES H. BOWDEN; DAVID J. ILLINGWORTH; KENNETH SUMNER; NELLCOR PURITAN BENNETT, INC., DEFENDANTS-APPELLEES.
 No. 98-15993
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 8, 1999--San Francisco
Filed June 6, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Leonard B. Simon (argued) and Eric A. Isaacson (briefed), Milberg Weiss Bershad Hynes & Lerach Llp, San Diego, California, for the plaintiffs-appellants.
 Darryl Rains, Morrison & Foerster Llp, San Francisco, California, for the defendants-appellees.
 Appeal from the United States District Court for the District of Northern California Charles A. Legge, District Judge, Presiding. D.C. No. CV-97-01319-CAL
 Before: James R. Browning, Pamela Ann Rymer, and Andrew J. Kleinfeld, Circuit Judges.
 
 
 1
 The opinion of the court was delivered by: Kleinfeld, Circuit Judge
 
 OPINION
 
 2
 This case concerns sufficiency of the pleadings in a securities fraud case.
 
 I. FACTS
 
 3
 The district court dismissed this case for failure to state a claim upon which relief could be granted, so we state the facts as they are stated in the complaint to determine whether the complaint states a claim upon which relief could be granted. In the context of securities litigation under the Private Securities Litigation Reform Act,[1] we may also properly consider SEC filings incorporated by reference in the complaint.[2] Nothing has been proved in this case because it was dismissed before the occasion arose for any proof, so, as in any decision reviewing a 12(b)(6) dismissal, our statement of facts should not be understood as a true description of anything that actually happened.
 
 
 4
 Larkin and the other defendants were officers and directors of Nellcor. It made medical devices for people with breathing difficulties. In May of 1995, Nellcor announced that it was making a very large acquisition, paying $475 million for a company called Puritan Bennett. Puritan Bennett had been losing money and had just laid off a sixth of its personnel. This raised the obvious question of how Nellcor could expect to make money by spending almost a half billion dollars to acquire a company that was losing money. But Nellcor's principals said they expected the combined company to make money because it would dominate the market for respiratory care products, would have much greater financial strength because of its size, and would have lower overhead than the combined overhead of the two companies operating separately.
 
 
 5
 The theory of the complaint is that the merger was a failure and that the Nellcor principals knew that almost from the start. But they repeatedly lied to the market through stock analysts and press releases, misleading the stock market into overvaluing their stock based on a false impression that the merger was going well. Meanwhile, the principals sold off their personal stock as the time approached for the truth to come out. They made a great deal of money from the people who were misled by their false statements, and when the bad news came out, the price of the stock dropped.
 
 
 6
 Plaintiffs brought a class action suit on behalf of shareholders who purchased the stock of the combined company between the time Nellcor filed an optimistic 10-K report about the merger and the time it announced that earnings would be "well below expectations," driving the price of the stock down. The district judge concluded that the pleadings lacked adequate specificity and dismissed the complaint. He dismissed with prejudice, because the plaintiffs had already had an opportunity to amend the complaint to cure the defect. He did not reach the issue of class certification. Plaintiffs appeal.
 
 II. ANALYSIS
 
 7
 Securities fraud class actions are not all good or all bad. In a large public securities market, dishonest insiders may be able to cover their tracks fairly well, and falsely claim to be as surprised as the ribbon clerks, when they take the market for a ride. Unless reasonable inferences from circumstances suffice to get a case to a jury, the welfare of victimized investors and the integrity of the stock market may be insufficiently protected from deceptive manipulators. Capital may be inefficiently diverted from honest to dishonest enterprises. But plaintiffs can also be undeserving, and lawsuits can extort a great deal of undeserved settlement money if the courts do not filter out the unfounded ones early enough to avoid huge litigation expenses. Juries can make mistakes, especially in matters of great complexity where the trials are lengthy. If a defendant is entirely innocent of wrongdoing, yet faces a 10% chance of a $100 million dollar jury error, the rational course, if the case cannot be kept from a jury, may be to pay $10 million undeserved dollars. That just wastes capital and unfairly transfers money from those who have earned it to those who have not. Securities fraud cases typically claim that optimistic statements were lies. But business decisions have to be based on predictions about the future that "can only be taken as a result of animal spirits,"[3] and "if the animal spirits are dimmed and the spontaneous optimism falters, leaving us to depend on nothing but a mathematical expectation, enterprise will fade and die."[4]
 
 
 8
 A. The Private Securities Litigation Reform Act.
 
 
 9
 There is but one issue raised in this appeal, whether the complaint stated a claim upon which relief could be granted.[5] This inquiry is governed by the Private Securities Litigation Reform Act of 1995 (PSLRA), which altered our pre-Act pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter.[6] Pursuant to the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[7] The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"[8] -- that is, that he acted with intentionality or deliberate recklessness[9] or, where the challenged act is a forward looking statement, with "actual knowledge . . . that the statement was false or misleading."[10]
 
 
 10
 Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§§§ 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether "particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or `deliberate recklessness' made false or misleading statements to investors."[11] Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a "strong inference" that misleading statements were knowingly or deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).
 
 
 11
 B. Sufficiency of the allegations.
 
 
 12
 1. September and October 1995.
 
 
 13
 On September 29, 1995, Nellcor's annual report to the shareholders said that "growth opportunities . . . will be significantly enhanced" by the merger and that "we expect earnings accretion in the first year . . . [and] anticipate cost savings through consolidation of facilities and operations." On October 16, defendants Larkin and Downey, Nellcor's Chief Executive Officer and Chief Financial Officer, told securities analysts that
 
 
 14
 International and Homecare markets were driving Nellcor's growth. Homecare revenues, which represent 43% of Nellcor's business, were up 21% in the quarter.
 
 
 15
 The consolidation of Nellcor's and Puritan Bennett's U.S. sales and distribution efforts would be completed by the end of the second quarter and corporate staff consolidation by the end of the third quarter.
 
 
 16
 Nellcor expected to reduce headcount by at least 300 as merger synergies were effected. This would set the stage for leveraged [earnings per share] growth to $2.65-$2.70 and $3.15-$3.35 for [fiscal year] 96-97, respectively.
 
 
 17
 Numerous other optimistic predictions about the merger were made to the public by defendants during this first couple of months: the new company "will be the leading provider," growth opportunities "will be significantly enhanced," "we expect" higher earnings and cost savings, etc. The merged company's "plan to cut about 300 jobs" by consolidating sales forces largely in the quarter then beginning was"on track" and would cut expenses.
 
 
 18
 The complaint alleges that these statements "were false and misleading when issued," because the merger "would hurt Nellcor's earnings" and provide no revenue and cost benefits. It was "not true" that the sales force consolidation "would be completed" by the end of the quarter nor would earnings grow as much as predicted, etc. But no facts are alleged in the complaint that would support an inference that the company's more optimistic predictions were known to be false or misleading at that time by the people who made them. The complaint does not plead facts that show that company insiders knew what the complaint says "would" occur in what was then the future.[12] That a pessimistic argument could have been made against the merger, and that had they known in September what they learned by the following May they would not have spoken so optimistically, does not raise a strong inference that defendants actually knew their forward looking statements to investors were false or misleading when made.[13]
 
 
 19
 2. December 1995.
 
 
 20
 In late December 1995, defendants Larkin and Downey told analysts that "Nellcor's sales growth was accelerating," that "Nellcor expected [earnings per share ] growth of 20%+, with even higher growth in the near term," and that "[t]he Nellcor and Puritan Bennett administrative and marketing positions had already been rationalized." The complaint alleges that these statements were false when made, because sales growth was not accelerating, Nellcor did not expect earnings to grow as predicted, and consolidation of the sales forces had encountered problems.
 
 
 21
 It is difficult to see how claimed knowledge of problems consolidating the sales forces is material. Much of any business consists of having problems and dealing with them. Anyone, insider or not, would expect to encounter problems if they planned to fire 300 people from their jobs. There is nothing about the problems attendant upon firing 300 people that suggests intentional or deliberately reckless falsity or deception in the statement that the company expected to make more money by doing so.
 
 
 22
 The statement that "sales growth was accelerating," though, is specific, and the complaint states a reason why it is false: that sales growth was not accelerating. The statement is material and descriptive of historical fact, rather than forward looking. The statement that "growth" is "accelerating" means that a graph of sales against time shows a concave line. Prospective investors deciding whether a business is doing well look at whether sales revenue is flat, increasing, or declining, and if it is increasing or declining, whether the change appears to be accelerating or flattening out. Sales that are not only growing, but growing faster and faster, matter to an investor.
 
 
 23
 Plaintiffs, however, merely assert that the statement was false at the time it was made. They do not specify facts or evidence that show why the statement was false at the time it was made nor that defendants knew or with deliberate recklessness disregarded that it was false. The complaint fails to describe, chart or graph what sales actually did. Nor does the complaint identify any documents or facts suggesting that the defendants knew that the growth rate was not accelerating. It is not sufficient simply to allege that a statement was false.[14] Plaintiffs must state with particularity all facts upon which their belief that sales were not accelerating was based.[15] The complaint does not meet that statutory requirement.
 
 
 24
 3. January through March 1996.
 
 
 25
 (a) Consolidation Issues.
 
 
 26
 On January 16, 1996, Nellcor issued a press release. The press release stated: "[a] major achievement during the second quarter was the consolidation and restructuring of the company's U.S. and international field sales organizations. The company now has in place a unified and very customer focused sales organization dedicated to meeting the needs of respiratory-impaired patients worldwide." Also on January 16, 1996, defendants Larkin and Downey spoke with securities analysts and stated that "[t]he consolidation of Nellcor's and Puritan Bennett's U.S. sales and distribution efforts had been completed." Then, on March 12, 1996, defendants Larkin and DeBuono spoke with more securities analysts relaying that "Nellcor's Homecare organization was in place."
 
 
 27
 Plaintiffs allege that the defendants misstated the historical facts of how and when the consolidation was completed. First, they claim that the defendants said that the consolidation of the sales and distribution units had been completed by the end of the second quarter, when, in fact, the units were not consolidated until the third quarter. To show that these statements were deliberately misleading when made, the plaintiffs rely on the defendants' April 1996 statement that third quarter earnings were below expectations "due to revenue shortfalls due to the termination of the Company's independent Homecare distribution network and its transition to a newly integrated direct sales force."
 
 
 28
 This 1996 press statement does not, however, raise a strong inference that defendants intentionally or with deliberate recklessness misled investors. It says, "[a]lthough sales levels across most of the home care business product lines were higher than the prior year, revenue growth rates for the third quarter were significantly impacted by the termination of the company's independent home care distributor network at the end of the second quarter, and the transition to a newly integrated direct sales force." A practical translation, shorn of euphemism, would be "we fired the salespeople we had planned to get rid of, but our sales growth is slowed because the remaining salespeople don't yet have as much selling ability yet with some customers." Plaintiffs seem to concede this point when they allege that the defendants' statements were false because the two companies were not, in fact,"successfully consolidated." Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness.
 
 
 29
 Plaintiffs' allegations simply do not state a set of facts raising a strong inference that the statements were intentionally false, misleading or made with deliberate recklessness. To meet this pleading requirement, the complaint must contain allegations of specific "contemporaneous statements or conditions" that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made.[16] The complaint does not meet this standard.
 
 
 30
 Plaintiffs attempt to meet the specificity requirement by pleading that "the consolidation of [the] sales forces and marketing operations had not gone well, significant problems persisted which were resulting in inefficiencies and cost excesses," and that "the consolidation . . . was plagued by continuing difficult problems resulting in cost inefficiencies, waste and lack of revenue growth." Nowhere does plaintiffs' complaint state what these "significant" or"difficult" problems were or how they show that the two companies were operating separately at a time when they were claimed to have been consolidated. Nowhere does plaintiffs' complaint state what kind of "inefficiencies" existed, identify an amount of "cost excesses" or "lack of revenue growth, " or state how these inefficiencies, cost excesses, and lack of revenue growth show that the companies were not consolidated. We cannot discern what statements the complaint says were false or misleading nor the basis for concluding they were made intentionally or with deliberate recklessness.
 
 
 31
 Plaintiffs argue that the defendants' statement about third quarter earnings being less than expected "due to " the termination of the independent Homecare distribution network and transition was a "later statement by the defendant along the lines of `I knew it all along.' "[17] The statement arguably implies that the consolidation of marketing had not worked out as well and as rapidly as hoped. The statement does not support an inference that company insiders knew or with deliberate recklessness disregarded that the problems would be so substantial.
 
 
 32
 Our decision in Yourish[18] supports this analysis. There, the plaintiffs claimed that the defendants' statement that it knew it was not going to repeat "some very heavy shipments to Southeast Asia"[19] was an admission that its earlier statements about the company's strong international sales were false. We rejected this argument, because not repeating heavy shipments was not necessarily inconsistent with having strong international sales.
 
 
 33
 The complaint never alleges a statement by Defendants that would indicate such "heavy shipments " as the $7 million system launch order from IBC were expected to repeat in Southeast Asia. Only such a specific statement could be contradicted by [the] October 1996 statement. Without such a specific statement, the October 1996 statement does not approach the `I knew it all along' admission envisioned in GlenFed.[20]
 
 
 34
 Here, the later statement admits only that the below-expectation earnings in the third quarter were a result of the prior integration of the two companies' sales forces, which concedes no intentional or deliberately reckless falsehood or deception at all. The statement, "the storm is passing and it will be sunny tomorrow," when it in fact continues to snow the next day, may be bad forecasting, but it is not necessarily a lie. Without more, it does not raise a strong inference of intentional or deliberately reckless falsity or deception.
 
 
 35
 (b) Decreased Operating Expenses.
 
 
 36
 In addition to discussing the consolidation, the January press release went further to state that "the favorable effect of initial merger synergies and other operational improvements contributed to a decrease in operating expenses . . . ." In the March discussion with analysts, defendants also indicated that "[s]ynergies from the Puritan Bennett acquisition have only been realized in sales and marketing, as the best of the two hospital sales forces were combined (with positive initial results . . .)." In plain English, this means"we've cut expenses by firing a lot of salespeople."
 
 
 37
 Plaintiffs allege that the defendants' claims that the merger had decreased expenses were false when made because, although expenses had decreased, the decrease was because certain expenses were deferred. They do not sufficiently explain why the statement is false or misleading, because they do not say what expenses were deferred, nor that"merger synergies" (presumably not paying the salespeople who were let go) did not also reduce expenses.
 
 
 38
 As to the salespeople, plaintiffs allege that Nellcor was "experiencing . . . substantial difficulty in attempting to merge the direct sales and marketing operations of the two operations," that "the consolidation and combination of the sales and marketing forces had not gone well and was having negative results, including excessive costs," and that the reported "cost reductions were the result of deferring the recognition of certain costs." That lacks the requisite specificity. The company says it reduced overhead by firing a lot of salespeople. The plaintiffs allege that marketing was impaired as a result. This is perfectly plausible. Salespeople perform valuable functions based on detailed personal knowledge developed in the course of extensive experience. Fire a salesperson, and perhaps years of accumulated knowledge of a customer's needs and preferences are lost. But it does not make a lie of the company's statements, nor does it make them misleading or made with deliberate recklessness. People have underestimated the value of salespeople since time immemorial. Alleging in substance that Nellcor underestimated the difficulties it would face if it fired 300 salespeople does not make out a fraud case.
 
 
 39
 (c) Increased Earnings.
 
 
 40
 Defendants made additional comments on January 16, 1996 to securities analysts by reporting that "January was off to a strong start" and "EPS was expected to grow at a 20%+ annual rate over the next several years, driven by sales and cost synergies stemming from the merger with Puritan Bennett. Even faster EPS growth would occur in F96/97 with EPS likely to ramp up 25%-30%. Nellcor expected F96/97 EPS of $2.65-$2.70 and $3.25-$3.35 per share, respectively. " They also made comments in March stating that "[h]omecare sales had picked up in March, [and] Nellcor's business was stronger than earlier projected . . . .)".
 
 
 41
 Plaintiffs allege that defendants said revenues were increasing during the second and third quarters, when in fact the company was experiencing decreased earnings. Plaintiffs explain that this lack of revenue growth was caused by "the serious operational problems in Puritan Bennett's Homecare operation," the "substantial difficulty in attempting to merge the direct sales and marketing operations of the two operations, . . . especially in its Homecare operation, " and "the consolidation['s] . . . continuing difficult problems." The circumstances are not inconsistent with the statements so as to show that the statements must have been false or misleading when made. A company could experience "serious operational problems," "substantial difficult[ies]," and "difficult problems" and still have increasing revenues. Homecare sales could have picked up while profits overall declined.
 
 
 42
 Plaintiffs' complaint was required to allege specific facts that show how these "problems" and "difficulties" translated into decreasing revenues. It fails to do so. Plaintiffs' complaint does not explain what the "serious operational problems" were, what kind of "substantial difficult[ies]" were being experienced, and why these "difficult problems" decreased revenues. These allegations do not meet the level of specificity required by the PSLRA and our caselaw interpreting it. Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements.
 
 
 43
 So far, there is not much more to the case beyond the facts that (1) two companies merge, expecting to increase profits in significant part by using fewer salespeople than their combined total, because their products and markets are related; (2) they fire a lot of salespeople; and (3) this is not as productive a maneuver as they had hoped. The third proposition can be true without the first being false. The averments of fraud are not specific and corroborated enough for controlling statutory and case law.
 
 
 44
 C. Stock Sales.
 
 
 45
 The plaintiffs have identified eleven defendants whom they allege engaged in insider trading around the same time that the optimistic predictions and false statements were being made. These include the chief executive officer, three executive vice-presidents, one of whom was the chief financial officer, and seven vice-presidents. This group includes all but one of the executive management committee members and the one not sued had just joined the executive committee three months before the class period.
 
 
 46
 Insider trading goes more directly toward proving that the defendants knew the statement was false than proving that the statement itself was false. But proof of knowledge of falsity and falsity may overlap. For example, suppose that a police officer approaches a crowd to see what is going on, and a man walks out of the crowd, sees the police officer, and puts his hands together to be handcuffed. The man's actions suggest both that he knows he is guilty of some crime and also that some crime has been committed. Insider trading can work in the same way. If insiders owning much of a company's stock make rosy characterizations of company performance to the market while simultaneously selling off all their stock for no apparent reason, their sales may support inferences both that their rosy characterizations are false and that they knew it. We have considered insider trading as circumstantial evidence that a statement was false when made.[21]
 
 
 47
 But not every sale of stock by a corporate insider shows that the share price is about to decline. A corporate insider may sell stock to fund major family expenses, diversify his portfolio, or arrange his estate plan. He may sell stock in a pattern that has nothing to do with any inside information, such as selling stock twice a year when the college tuition for his children is due. Our cases dealing with pleading insider trading to prove scienter are instructive. They require a plaintiff to allege "unusual" or "suspicious " stock sales. "[I]nsider trading is suspicious only when it is `dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' "[22] We have identified three relevant factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."[23]
 
 
 48
 Plaintiffs allege insider trading by eleven insiders. Some of these sales, however, are not suspicious in amount. For example, the two insiders who made most of the representations at issue,[24] Larkin, the Chief Executive Officer, and Downey, the Chief Financial Officer, sold only 10 percent and 17 percent, respectively, of their total number of shares and options.[25] These figures are just above the 7.7 percent and 6.9 percent that we held not to be suspicious in Silicon Graphics.[26]
 
 
 49
 Several of the sales are suspicious in amount, but not in timing, and the sales do not appear calculated to maximize the personal benefit from undisclosed inside information. Seven of the insiders who sold 69 percent or more of their total stock and options during the class period, did so during October and January at share prices between $52 7/8 and $56 1/4. But the share price rose to $73 in March after they had sold their stock, and when the below-expectation earnings report was released in April, the stock dropped to $49. When insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know. Had the insiders been"talking the stock up" and liquidating their holdings at $73, that might show that they knew it was overpriced even as they"talked it up." But selling stock for $54, when the price subsequently rises to $74 and then sinks to $49, does not support an inference of knowing falsehood. They sold at about what the stock was worth after the bad news was public, not when they might have gained market advantage from as yet undisclosed bad news.
 
 
 50
 The most troubling insider sales were by DeBuono, the executive vice president and general counsel. She sold 98 percent of her total shares at prices ranging from $57 to $64. These sales exceed any of those in Silicon Graphics, and support an implication that DeBuono knew the rosy characterizations were false when made. But even if we were to treat her trading as suspicious in amount and timing, the plaintiffs have not alleged sufficient trading history for us to conclude that her trading was "dramatically out of line with prior trading practices." Plaintiffs' complaint contains several graphs on trading history. One graph, lumping together all of the defendants' stock sales, covers the period from January 1995 to December 1996, seven months before the class period and twelve months after the period. Graphs for each individual defendant then cover the period from April 1995 to April 1997, five months before the class period and twelve months after the period.
 
 
 51
 Plaintiffs argue that this is sufficient under In re Apple Computer Securities Litigation,[27] which compared the 10 months preceding a 10 month class period to determine whether the alleged insider trading was consistent with the prior pattern of sales. But Apple did not involve a merger. Here, the company was engaged in non-public merger discussions with Puritan-Bennett until May 1995, and the officers could not have traded, knowing of the non-public merger discussions, during that time without violating 15 U.S.C. §§ 78(j)(b). Thus, the seven month trading period prior to the class period offered by plaintiffs to prove the defendants pattern of trading does not prove much about their trading habits, since they were not able to trade during some or much of that time under SEC regulations.
 
 
 52
 In re Silicon Graphics suggests that restrictions on an insider's ability to trade are important in determining whether the trading pattern is suspicious.[28] There, the court held that one of the reasons an insider who traded 75.3 percent of his holdings had not engaged in suspicious trading, despite the high level of trading, was because he "was legally forbidden to trade" for a significant period before the alleged insider trading.[29]
 
 
 53
 Also, DeBuono's trading supports only a weak inference, not a strong one, in light of what the other, equally knowledgeable, insiders were doing. They sold too soon to be taking advantage of their allegedly fraudulent statements, because the price increase allegedly caused by the fraud occurred after they sold, and the price at which they sold is about where the stock ended up after the alleged false statements were corrected. One insider's well timed sales do not support the "strong inference" required by the statute[30] where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made.[31]
 
 
 54
 In order for plaintiffs to rely on insider trading as circumstantial evidence of falsity, they must allege sufficient context of insider trading for us to determine whether the level of trading is "dramatically out of line with prior trading practices." This requirement does not place an undue burden on plaintiffs. Section 16(a) of the Securities Exchange Act of 1934 requires that all directors and officers selling securities in their own corporation file a Form 4, Statement of Changes in Beneficial Ownership.[32] This record of insider sales is a matter of public record, and plaintiffs can get the insider trading reports from the Securities and Exchange Commission for the months prior to the class period to show the pattern of trading.
 
 
 55
 D. Timing.
 
 
 56
 Finally, we turn to the plaintiff's reliance on the temporal proximity between the last favorable statements and the bad news as circumstantial evidence that defendants intentionally or with deliberate recklessness made false or misleading statements to investors. Having concluded that none of the plaintiff's other allegations are sufficiently specific, we now conclude that the five week period between the optimistic statements and the below-expectation earnings report is not enough to sustain the complaint. In Yourish, we explained that "[w]e have allowed the temporal proximity of an allegedly fraudulent statement or omission and a later disclosure to bolster a complaint, but we have never allowed the temporal proximity between the two, without more, to satisfy the requirements of Rule 9(b)."[33] We hold the same in the context of the PSLRA: Because the complaint's remaining allegations do not comport with the requirements of the PSLRA, the temporal proximity of the statements, in and of itself, is insufficient.[34]
 
 III. CONCLUSION
 
 57
 The heightened pleading requirements of the Private Securities Litigation Reform Act are an unusual deviation from the usually lenient requirements of federal rules pleading. In few other areas are motions to dismiss for failure to state a claim upon which relief can be granted so powerful. The various requirements are not satisfied merely by making a complaint long. For a securities fraud case based on false statements to survive a motion, the pleading has to state particularized facts that, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors. Calling executives bad managers, or bad forecasters, does not plead fraud, except where it can be shown that they knew or were deliberately reckless in disregarding the misleading nature of their forecasts. We conclude that, taken as a whole, the allegations in this case do not raise a strong enough inference of securities fraud to meet the heightened pleading requirements of the PSLRA. Dismissal under 12(b)(6) was proper.
 
 
 58
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 15 U.S.C. §§ 78u-4 (1996).
 
 
 [2]
 See In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970, 986 (9th Cir. 1999).
 
 
 [3]
 John Maynard Keynes, The General Theory of Employment Interest and Money 161 (1956).
 
 
 [4]
 Id. at 162.
 
 
 [5]
 Fed. R. Civ. P. 12(b)(6).
 
 
 [6]
 Our pre-Act pleading requirements in private securities fraud litigation were governed by Fed. R. Civ. P. 9(b), which required only that "falsity" be pled with particularity; scienter could be averred generally. See Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."); In re Glenfed Inc., Sec. Litig., 42 F.3d 1541, 1547 (9th Cir. 1994) ("We conclude that plaintiffs may aver scienter . . . simply by saying that scienter existed.").
 
 
 [7]
 15 U.S.C. §§ 78u-4(b)(1).
 
 
 [8]
 15 U.S.C. §§ 78u-4(b)(2).
 
 
 [9]
 Silicon Graphics, 183 F.3d at 979.
 
 
 [10]
 15 U.S.C. §§ 78u-5(c)(1).
 
 
 [11]
 Silicon Graphics, 183 F.3d at 979; Heliotrope General, 189 F.3d 971, 979 (9th Cir. 1999).
 
 
 [12]
 "[F]raud by hindsight is not actionable." Arazie v. Mullane, 2 F.3d 1456, 1468 (9th Cir. 1993) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 628 (7th Cir. 1990)).
 
 
 [13]
 See In re Glenfed, 42 F.3d at 1548 (finding "no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation . . . .").
 
 
 [14]
 See In re Glenfed, 42 F.3d at 1552 (holding that plaintiffs may not "merely proclaim in the most conclusory of fashion that the defendants made false statements.")
 
 
 [15]
 15 U.S.C. §§ 78u-4(b)(1).
 
 
 [16]
 Cf. In re GlenFed, 42 F.3d at 1548 (announcing "contemporaneous statements or conditions" standard in Rule 9(b) context).
 
 
 [17]
 In re GlenFed, 42 F.3d at 1549 n.9.
 
 
 [18]
 Yourish v. California Amplifier , 191 F.3d 983 (9th Cir. 1999).
 
 
 [19]
 See id. at 996.
 
 
 [20]
 Id. at 996-97.
 
 
 [21]
 See Cooper, 136 F.3d at 626; Fecht, 70 F.3d at 1083 (9th Cir. 1995)
 
 
 [22]
 In re Silicon Graphics, 183 F.3d at 986 (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989)) (emphasis added).
 
 
 [23]
 Id.
 
 
 [24]
 See id. at 988 (finding relevant the fact that a particular insider did not make any of the allegedly misleading statements).
 
 
 [25]
 Stock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them. See id. at 986.
 
 
 [26]
 Id. at 987.
 
 
 [27]
 In re Apple Computer Sec. Litig., 886 F.2d 1109, 1111 (9th Cir. 1989).
 
 
 [28]
 See In re Silicon Graphics, 183 F.3d at 987-88.
 
 
 [29]
 See id. at 987.
 
 
 [30]
 15 U.S.C. 78u-4(b)(2).
 
 
 [31]
 See Acito v. Imcera Group, Inc. , 47 F.3d 47, 54 (2nd. Cir. 1995) (relying on In re Cypress Semiconductor Sec. Litig., Fed. Sec. L. Rep. (CCH) ¶¶ 97,060, at 94,697, 1992 WL 394927 (N.D. Cal. 1992) (holding that plaintiffs' claims that defendants artificially inflated the company's share price so that they could sell their stock at a huge profit was undermined by the fact that one of the four defendants did not sell his stock during the class period).
 
 
 [32]
 15 U.S.C. §§ 78p(a).
 
 
 [33]
 Yourish, 191 F.3d at 997.
 
 
 [34]
 See id.