**In re NIKE, INC. SECURITIES LITIGATION.**

**This Document Relates To All Actions.**

**No. 01–332–KI.**

United States District Court, D. Oregon.

Jan. 25, 2002.

Deborah R. Gross, Susan R. Gross, Law Offices of Bernard M. Gross P.C., Philadelphia, PA, Gary I. Grenley, Grenley Rotenberg Evans Bragg & Bodie, P.C., Portland, OR, Jonah H. Goldstein, Mark Solomon, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, for Plaintiff.

Peter H. Koehler, Jr., Tonkon Torp LLP, Portland, OR, Robert P. Varian, Penelope A. Graboys, Margaret M. Snyder, Jonathan B. Gaskin, Brobeck, Phleger & Harrison LLP, San Francisco, CA, for Defendants.

## OPINION

KING, District Judge.

Following a dramatic drop in the price of Nike, Inc., stock, numerous actions were filed against Nike and five of its corporate officers alleging violations of the Securities Exchange Act of 1934. These were consolidated into the proposed class action assigned to me. Before the court is defendants' motion to dismiss (# 37). For the reasons below, I dismiss the complaint and give plaintiffs leave to replead.

## BACKGROUND

I will discuss plaintiffs' allegations in more detail below. In general, plaintiffs' theory of the case is that Nike announced favorable second quarter 2001 earnings on December 19, 2000, and stated that the company was on-track to report mid-teens earnings growth for fiscal year 2001, ending on May 31, 2001. This announcement caused the stock price to increase. According to plaintiffs, defendants' statements were false and misleading because they knew, but did not disclose, the fact that problems with Nike's new demand/supply planning system, which I will call the i2 system, were causing reduced revenues and profits in the third quarter. Due to the lack of disclosure, Nike stock traded at inflated levels during the proposed class period. Individual defendants took advantage of the inflated price by selling some of their shares.

On February 26, 2001, Nike announced that its third quarter 2001 earnings would be much lower than previously forecast due to the problems of implementing its i2 system and the resulting excess unpopular inventory and insufficient popular inventory. This announcement caused a decline in the stock price, to the detriment of the proposed class members who retained their stock.

Plaintiffs allege claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and associated Rule 10b–5.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) will only be granted if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle him to relief." *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 248 (9th Cir.1997). All allegations of material fact are taken as true and viewed in the light most favorable to the non-moving party. *Id.*

## DISCUSSION

"Much of any business consists of having problems and dealing with them." *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (discussing sufficiency of § 10(b) allegations). The issue before me is whether Nike legitimately dealt with problems that arose when phasing in the new i2 system or whether it fraudulently failed to disclose knowledge of the financial effects of the problems, thus violating securities law. Defendants make several alternative arguments to dismiss the complaint.

### I. *Sufficiency of Fraud Allegations*

Defendants contend that the consolidated amended complaint ("Complaint") lacks the specific factual allegations necessary to avoid dismissal of a § 10(b) claim. In particular, defendants contend that the following information is lacking in the Complaint: (1) reference to weekly reports and meetings without pleading .corroborating details such as the source of the information; (2) no identification of specific products in allegations on the buildup and shortages of certain inventory; and (3) no allegations connecting problems with the i2 system to knowledge of the effects on financials. Defendants also caution that plaintiffs are confusing the i2 system with a wholly unrelated automatic replenishment program.

In response, plaintiffs contend that a strong inference of scienter is raised by allegations that: (1) Nike invested $400 million to replace its antiquated planning system; (2) individual defendants would have been reckless in the extreme if they did not closely monitor the success of the new i2 system; (3) Nike suffered tremendous losses prior to its false third quarter 2001 projections; (4) Nike admitted that it

actually knew of the problems caused by the i2 system and the resulting losses six months before the false projections; (5) individual defendants took advantage of the inflated stock price by selling shares worth $20.96 million; and (6) defendants dramatically cut back the Nike stock repurchase program when the i2 system went live.

## A. *The Law*

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") "to put an end to the practice of pleading 'fraud by hindsight.'" *In re Silicon Graphics, Inc., Securities Litigation,* 183 F.3d 970, 988 (9th Cir.1999) (internal quotation omitted). The PSLRA provides:

> (b) Requirements for securities fraud actions
>
> . . . .
>
> (2) In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2).

██ A violation of § 10(b) of the Securities Exchange Act of 1934 requires proof of scienter, defined in that context as a "mental state embracing intent to deceive, manipulate, or defraud." *Silicon Graphics,* 183 F.3d at 975 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). The definition was broadened to include reckless conduct, defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a

danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 976 (citing *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991)). The Circuit has further stated that recklessness only satisfies scienter under § 10(b) "to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977.

The Ninth Circuit has interpreted the PSLRA pleading requirement as follows:

> We hold that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct. . . . We hold that although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity. Accordingly, we hold that particular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA.

*Silicon Graphics,* 183 F.3d at 974 (emphasis in the original).

██ To plead with particularity, as required by PSLRA, a plaintiff must "provide all the facts forming the basis for his belief in great detail." *Id.* at 983. In *Silicon Graphics,* the court held that the complaint lacked sufficient detail and foundation necessary to meet either the particularity or strong inference requirements of

the PSLRA. Plaintiff alleged that internal reports contradicted positive public statements made by corporate officers. She did not allege, however, the contents of the reports, who prepared them, which officers reviewed them, and from whom she obtained the information. *Id.* at 984. Thus, the court held that without such specifics, it could not ascertain if there was a basis for alleging that the officers knew that their statements were false at the time they were made, a required element in pleading fraud and § 10(b) allegations. *Id.* at 985.

■ The court may judicially notice facts from publicly available documents. *In re Silicon Graphics, Inc., Securities Litigation*, 183 F.3d at 986–87 (proper to consider SEC filings referenced in the complaint). All parties have provided me with numerous documents on which I can rely and have not objected to the others' request for judicial notice.

## B. *The Allegations*

The allegations made in plaintiffs' complaint that are relevant to this motion are summarized below.

Nike designs and markets athletic footwear, apparel and equipment. During the proposed class period of December 20, 2000, through February 26, 2001, defendant Knight was its Chairman, President and Chief Executive Officer; defendant Clarke was the President of New Business Ventures; defendant Denson was the Vice–President of Nike–USA; defendant DeStefano was Vice–President of Asia Pacific; and defendant Parker was Vice President of Global Footwear. Because of their positions, the individual defendants had the authority to control the contents of Nike's quarterly reports and press releases and were provided with copies prior to or shortly after their issuance. Because of their positions and access to material non-public information, each of the individual defendants knew that adverse facts were being concealed from the public and that the positive representations were materially false and misleading.

By the spring of 2000, analysts were anticipating new growth initiatives to serve as a catalyst for Nike's stock price. An important element of Nike's growth strategy was the implementation of a new computerized i2 system. In early 1999, Nike began ordering $400 million of computer software for the i2 system.

Prior to June 2000, Nike's top officers became aware that serious problems existed in the implementation and integration of the i2 system. The Nike managers running the implementation, Richards and Steele, made numerous complaints to the i2 vendor: (1) a lack of common rules between different pieces of software; (2) differences in handling data necessitated manual changes for integration; (3) inability to handle the volume of product numbers or stock keeping units; (4) inability to communicate with Nike's existing computer systems; and (5) exceedingly slow performance.

The i2 system went "live," or began processing actual data, in June 2000, resulting in immediate severe malfunctions. Double orders for millions of shoes in poor demand, such as the "Air Garnett II," were sent to Asia. Insufficient orders for popular show models, such as "Air Force Ones," were placed. Ordering data was lost after six to eight weeks so Nike could not determine what it had ordered. This resulted in Nike accepting up to $90 million worth of poorly selling shoes and having a $80–100 million shortfall of shoes in strong demand. Some shoes were shipped by plane rather than by boat, at an additional cost of $3.25 to $7.25 per pair, as a way to offset shipping delays.

Defendants had controls in place to make them promptly aware of inventory shortages and buildups, delays in shipment, and increased delivery costs. Nike's order confirmation system provided daily and weekly status reports. On implementation of i2, Nike established weekly management "footwear operations" meetings which generated a weekly report on whether Nike was meeting demand for its products.

In November 2000, defendants retained independent consultants to create alternate databases to bypass part of the i2 system. Groups were formed to deal with the problems ·created by the i2 system. These facts show that Nike was aware in November 2000 that the flawed i2 system was adversely affecting Nike's inventory controls and its resulting third quarter revenue and profits.

On December 19, 2000, Nike reported second quarter earnings. In commenting on the results, Knight stated in part:

> We delivered another strong quarter of revenue growth while experiencing important improvement in the U.S. market. With more than one-third of our total revenue generated by business that is not included on our futures orders program, such as equipment, Nike retail, and our automatic replenishment program, we are driving healthy growth that will help us achieve our previously stated goal of mid-teens earnings per share growth over last fiscal year.*

> *\* The marked paragraphs contain forward-looking statements that involve risks and uncertainties that could cause actual results to differ materially. These risks and uncertainties are detailed from time to time in reports filed by NIKE, Inc. with the S.E.C., including forms 8–K, 10–Q, and 10–K. Some forward-looking statements in this release concern changes in futures orders that are not necessarily indicative of changes in total revenues for subsequent periods due to the mix of futures and "at once" orders, which may vary significantly from quarter to quarter.*

On December 20, 2000, Nike held a conference call for analysts, money and portfolio managers, and other large investors. Plaintiffs summarize the statements by Knight and Denson as follows:

> The Company's automatic replenishment program would permit it to continue to record improved earnings in the third and fourth quarter of Fiscal Year 2001.

> Nike's planned marketing activities would lead to increased sales, and as a result, gross margins would improve to above 40% in Fiscal Year 2001.

> Nike's U.S. sales were showing significant signs of improvement.

> Nike was on track to report earnings per share of $2.36 for fiscal Year 2001.

Defendants knew that the statements on December 19 and 20, 2000, were false at the time they were made because defendants knew or recklessly disregarded the fact that the i2 system was causing insufficient production of popular shoes and excess production of unpopular shoes. As a result, defendants knew that Nike's results for the third quarter financial year 2001 would be worse than projected.

Before the statement on December 19, 2000, Nike stock closed at $47.5625. By December 29, 2000, the stock traded as high as $57. In late December 2000 through mid-January 2001, defendants took advantage of Nike's inflated prices and sold 401,288 shares of their personal holdings, receiving $20.96 million in gross proceeds. The dates of the sales, number of shares, and price per share are detailed in the Complaint, along with the allegation that DeStefano sold no Nike stock in 2000

and Clark sold only 85,000 shares earlier in 2000.

On February 26, 2001, Nike issued the following press release:

Nike, Inc. today reported that it expects to earn between $0.34 and $0.38 per share for the third quarter ending February 28, 2001, versus its previously stated guidance of $0.50 and $0.55 per share. The Company reaffirmed its previously announced earnings per share guidance for the fourth quarter ending May 31, 2001 of $0.60 to $0.65 per share. While the Company does not expect to achieve its mid-teens earnings per share growth target, it does anticipate positive earnings per share growth for the full fiscal year.

Philip H. Knight, Chairman and CEO, said, "We were anticipating a flat year-over-year third quarter largely because of weakness in our U.S. footwear revenues. During the quarter, we also experienced complications arising from the impact of implementing our new demand and supply planning systems and processes which resulted in product shortages and excesses as well as late deliveries. While we are disappointed by the impact it has had on our third quarter, we believe that we have addressed the issues around this implementation and that over the long term, we will achieve significant financial and organizational benefit from our global supply chain initiative."

Nike also held a conference call on February 26, 2001. Blair, Nike's Chief Financial Officer, stated:

As you know, earlier today we announced that for the third quarter ending February 29, 2001, we expect to earn between $0.34 and $0.38 per share versus the previously stated guidance of $0.50 and $0.55 a share.... What we did not anticipate was the additional short-fall resulting from the disruption of our global footwear supply chain caused by a series of events surrounding the implementation of new demand and supply-planning systems and processes. These supply chain issues resulted in significant amounts of excess inventory of some footwear models, while other models have been in short supply or delivered late. As a result, our third quarter revenues will be down significantly and our margins will suffer from the high discounts and air freight costs necessary to move the excess inventory through our system....

Last year we implemented these new demand planning systems and some attendant changes in process for the global footwear sourcing and initially the software did not perform as we expected and that made it very difficult for us to manage the global buy. And most of that impact has actually fallen into the U.S. because the U.S. operates on tighter time lines than the rest of the world. So disruptions in the supply chain tend to have the most severe impact on the U.S. The implications of the issues were that first of all we had excess product which meant that, as you know the ordering that we do before we have concrete future orders, we did some over ordering and so we had excess product. In addition, we had some models that had been ordered by customers that we did not place the order on a timely basis with the factory so we had shortage of the product or delays of product which results in lost sales and potentially the need to do some discounting to hold onto that business. And finally, we did have some air freight charges that are required to bring the product and to try to meet what deliveries we could. So that's really what the implications have been of the supply chain issues. As far

as timing on how that gets resolved, the major issue in the short term has been the shortages. The biggest impact of the P & L is the losses of revenue and the losses of margin for product that we actually can't deliver. Over a longer period of time, we obviously will need to liquidate our inventory position.

When the market opened the next day, February 27, 2001, Nike stock dropped as low as $38.26, a nearly 37% decline from the class period high of $60.0625.

Defendants contend that these allegations do not state facts which satisfy the PSLRA pleading requirements.

### C. *Analysis*

#### 1. *Allegations other than Stock Sales*

Defendants dispute the accuracy of plaintiffs' summary of the December 20, 2000, conference call. They contend that these statements were not made during the call and specifically note that the "automatic replenishment program" is a different thing than the "demand/supply planning system," which I refer to as the i2 system. One of the documents which I will judicially notice is a transcript of the conference call. After reviewing the entire transcript, I agree with defendants that these are not accurate summaries of the conference call. Under the high pleading standard set by the PSLRA and *Silicon Graphics*, I believe that actual quotes must be pleaded. 15 U.S.C. § 78u–4(b)(1)("the complaint shall specify each statement alleged to be misleading"). Thus, I will only analyze statements made during the December 19, 2000, press release.

Plaintiffs argue that Nike's $400 million investment in the i2 system was sufficiently massive that defendants would have been reckless in the extreme if they did not closely monitor the success of the new

system. Nike's selling and administrative expenses for fiscal year 2000 were $2,606.4 million. The $400 million expenditure, which appears to be the total investment for a two-year period, is a small percentage of the total expense being monitored.

■ Plaintiffs allege sufficient detail about the knowledge of i2 implementation problems held by Richards and Steele, the managers in charge of the project, and their complaints to the software vendor, but plaintiffs do not allege facts explaining how that knowledge became known by the individual defendants or other upper managers. Plaintiffs allege facts concerning the existence of daily and weekly status reports from the order confirmation system and weekly management "footwear operations" meetings. They make a start on required allegations concerning which styles of shoes were ordered in the wrong amounts and the size of the financial impact for these styles. They fail to allege, however, the corroborative facts required by *Silicon Graphics* of the contents of the reports, who prepared them, which officers reviewed them, and from whom plaintiffs obtained the information. *Silicon Graphics*, 183 F.3d at 984. Thus, I cannot determine if upper management knew of the extent of the problem in December 2000.

The allegations concerning the creation of alternate databases as a workaround in November 2000 also does not have sufficient corroboration to trace the extent of the knowledge.

Viewing the allegations as a whole, there is nothing sufficiently connecting the knowledge of the i2 implementation problems to the individual defendants or other upper managers. There is also nothing alleging facts on which to base an allegation of deliberate recklessness or conscious misconduct concerning the financial projections. Even if upper management fully understood the extent of the manufactur-

ing problem, plaintiffs are asking me to take a large leap: that Nike also fully understood the impact of the problem on its earnings per share. Plaintiffs essentially rely on the fact that if upper managers were doing their jobs properly, they would have figured out the severity of the situation and the impact on the company finances prior to making the statements on December 19, 2000. The case law does not allow this stretch. Concerning matters other than stock sales, plaintiffs have not alleged facts which establish a strong inference of deliberate recklessness.

### 2. *Stock Sales*

Defendants also contend that their stock sales are not unusual enough to give rise to a strong inference of fraudulent intent. In addition, defendants note that Knight, the Chairman, CEO, and President of Nike, along with nine other officers and directors of Nike, did not sell any Nike stock during the class period. Nike repurchased some of its stock during the class period when the value was allegedly artificially inflated.

■■■ Plaintiffs contend that the stock sale proceeds of $20.96 million between the defendants, combined with the large percentage of shares sold by them, the timing of the sales, and the inconsistency with prior trading practices, raise a strong inference of scienter. "Unusual" or "suspicious" stock sales by corporate insiders may constitute circumstantial evidence of scienter. Insider trading is suspicious, however, only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics, Inc., Securities Litigation*, 183 F.3d 970, 986 (9th Cir.1999) (internal quotation omitted). Factors the court is to consider include: (1) the amount and percentage of shares sold by

insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.* Plaintiffs bear the burden of alleging sufficient context of insider trading to determine whether the level of trading is out of line with prior practices. *Ronconi v. Larkin*, 253 F.3d 423, 436–37 (9th Cir.2001).

Plaintiffs allege that four of the five individual defendants sold 401,288 shares of Nike stock during the class period for proceeds of $20.96 million dollars. They provide the date, number of shares, and price for each sale, plus the allegation that DeStefano had sold no Nike stock earlier in 2000 and Clark sold only 85,000 shares earlier in 2000.

■■■ Plaintiffs failed to allege sufficient context of insider trades outside the class period for me to determine if the trading during the class period is out of line with prior practices. Because plaintiffs bear the burden for this, the lack of context would allow me to determine that the stock sales are not circumstantial evidence of fraudulent intent. Defendants provided documents from which I can take judicial notice of sales not pleaded, however, so I will analyze the situation assuming that the other trades could be pleaded by plaintiffs.

Several factors weigh against plaintiffs. The two officers alleged to have made the fraudulent statements, Knight and Blair, sold no stock during the class period. Defendants Denson and Parker sold 9.4% and 11.6% of their shares, respectively. These amounts are less than the figures of 10% and 17% held not to be suspicious in *Ronconi. Id.* at 435. Many of the sales occurred on December 21, 2000, only two days after the December 19 statement, and at prices ranging from $48.43 to $49.04: (1) 162,288 out of 302,288 shares sold by Clarke; (2) all 10,000 shares sold by Denson; and (3) 30,000 or 40,000 shares

sold by Parker. The stock closed at $47.5625 immediately prior to the statement on December 19, 2000, and traded at a class period high of $60.0625. The immediate sale of this many shares does not appear "calculated to maximize the personal benefit from undisclosed inside information." *Id.* No sales occurred within the month prior to the negative announcement on February 26, 2001, which caused the stock price to plummet.

In plaintiffs' favor, DeStefano sold 45.3% of his shares during the class period and Clarke sold 55.2% of his shares. Further, 140,000 of Clarke's 302,288 shares and all of DeStefano's 49,000 shares were sold between December 27, 2000, and January 18, 2001, at prices ranging from $55.96 to $56.13. This is near the top of the stock price during the class period.

The parties provide me with various statistics comparing the individual defendants' sales during the class period with the two-year period[1] prior to the class period:

| | Pre–Class Sales | Class Period Sales |
|---|---|---|
| Knight | 0 | 0 |
| Denson | 0 | 10,000 |
| Parker | 56,056 | 40,000 |
| DeStefano | 106,864 | 49,000 |
| Clarke | 245,000 | 302,288 |

Only Clarke's sales raise any suspicion and even he had significant sales prior to the class period. I cannot conclude that his sales are dramatically out of line with his own history. When considered in total, the stock sales of the individual defendants are not suspicious enough to constitute circumstantial evidence of scienter.

### 3. *Summary*

In summary, I conclude that plaintiffs have not pleaded, in sufficient detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious

misconduct. Although this conclusion is sufficient to dismiss the § 10(b) claim, I will address the arguments concerning the PSLRA safe harbor for forward-looking statements.

## II. *Forward–Looking Statements*

### A. *Actual Knowledge*

■ Defendants contend that the Complaint does not allege that they had actual knowledge that the forward-looking statements were false when made.

The PSLRA provides a safe harbor for forward-looking statements, defined in part as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

15 U.S.C. § 78u–5(i)(1).

Plaintiffs contend that the safe harbor cannot apply because the statements are not forward-looking but instead concern current and continuing business conditions.

In the December 19, 2000, press release, Knight stated:

We delivered another strong quarter of revenue growth while experiencing important improvement in the U.S. mar-

1. Actually January 1, 1999, through December 19, 2000.

ket. With more than one-third of our total revenue generated by business that is not included on our futures orders program, such as equipment, Nike retail, and our automatic replenishment program, we are driving healthy growth that will help us achieve our previously stated goal of mid-teens earnings per share growth over last fiscal year.

I disagree with plaintiffs. The phrase about achieving the "previously stated goal of mid-teens earnings per share growth over last fiscal year" is a projection of earnings per share which could be protected by the safe harbor provisions.

Under the PSLRA, there is no liability for forward-looking statements, whether written or oral, if:

> (B) the plaintiff fails to prove that the forward-looking statement—

>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

>> (ii) if made by a business entity; was—

>>> (I) made by or with the approval of an executive officer of that entity; and

>>> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c).

As discussed above, plaintiffs have not adequately alleged that the individuals knew the statements were false or misleading when made. Consequently, the statements are protected by the safe harbor provisions and the § 10(b) claim must be dismissed on this ground also.

### B. *Cautionary Statements*

Defendants alternatively contend that their forward-looking statements are not actionable because the accompanying cautionary disclosures bring the statements within the safe harbor provided by the PSLRA.

Plaintiffs contend that the cautionary language is insufficient because it is meaningless boilerplate that gives no hint of adverse factors the executives knew were confronting the company.

Under the PSLRA, there is no liability for forward-looking statements, whether written or oral, if:

> (A) the forward-looking statement is—

>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;

15 U.S.C. § 78u–5(c).

Knight's December 19, 2000, statements were accompanied by this text:

> *The marked paragraphs contain forward-looking statements that involve risks and uncertainties that could cause actual results to differ materially. These risks and uncertainties are detailed from time to time in reports filed by NIKE, Inc. with the S.E.C., including forms 8–K, 10–Q, and 10–K. Some forward-looking statements in this release concern changes in futures orders that are not necessarily indicative of changes in total revenues for subsequent periods due to the mix of futures and "at once" orders, which may vary significantly from quarter to quarter.*

The statements were identified as forward-looking statements. Thus, the issue is whether the cautionary statement meaningfully identifies important factors that could cause actual results to differ materi-

ally from the projected results in the statement.

The Eleventh Circuit analyzed a cautionary statement under the PSLRA in *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir.1999). The statement noted several things which could cause results to differ, including increased competition for reorders, whether a credit facility default would be waived, industry practices and purchasing decisions by customers, the price competitiveness of the generic drug industry, and a general reference to the company's SEC filings. The statement did not, however, mention the possibility of a large goodwill write down, which caused the drop in stock prices. The court held that to be "meaningful," the cautionary statement did not have to mention explicitly the factor which proved the projection inaccurate. The court reasoned that if an investor is warned of risks with a similar significance to the risk actually realized, he is on notice of the danger of the investment and can make an intelligent decision based on personal preferences for risk and reward. Thus, the court held that the cautionary statement excused the company from liability. *Id.* at 807.

The Sixth Circuit did not approve a cautionary statement in *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir.), *pet. for cert. filed,* 70 U.S.L.W. 3269 (Sept. 27, 2001). Medicaid provisions in the Balanced Budget Act of 1997 caused the health care company to lower its estimates of earnings, causing a 30% decline in its stock price. As the Act made its way through Congress, the company at first had cautionary language that its projections could be affected by possible legislation, cost-containment measures, problems in state licensure, and difficulties in integrating acquired entities. In the next two quarters' filings, the company only stated that it could not predict the form, effect, or likelihood of any proposed legislation. The

court held that the more limited cautionary statements provided no guidance, were not meaningful, "and were hardly even cautionary," and held that the statements did shelter the company from liability under the PSLRA. *Id.* at 559.

 Nike's cautionary statement notes that the mix of futures and "at once" orders, which varies from quarter to quarter, makes it difficult to correlate changes in total revenues from changes in futures orders. Plaintiffs characterize the statement as "boilerplate" because it does not discuss the problems being faced with the i2 system. This is not a requirement under *Harris* as long as the stated and actual risks have similar significance.

The single sentence about the mix of futures and "at once" orders is too cryptic to be meaningful to the average investor. It does not convey a risk of similar significance to the revenue losses caused by the manufacturing scheduling and ordering problems due to the i2 system. I conclude that the cautionary statement cannot be understood to warn about important factors which could result in revenue losses. Thus, the statement does not bring defendants within the PSLRA safe harbor for cautionary statements or protect them from liability.

### III. *Liability of Nonspeaking Defendants*

Defendants DeStefano, Parker, and Clarke are not alleged to have personally made any misstatement or omission. They contend that the allegations concerning "group-published" information is insufficient to hold them liable in light of the PSLRA's requirement to plead specific facts and not rely on corporate title.

Plaintiffs contend that the group pleading doctrine remains viable after enactment of the PSLRA.

Because I am dismissing the § 10(b) claim against all defendants on several oth-

er grounds, I decline to address this issue at this time. Defendants may raise it in future motions if they so desire.

#### IV. *Section 20(a) Claim*

To be liable under § 20(a), a defendant must be liable under another section of the Securities Exchange Act of 1934. *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999); 15 U.S.C. § 78t(a). Because the § 10(b) claim is dismissed, the § 20(a) is not viable at this time.

### CONCLUSION

Defendants' motion to dismiss (# 37) is granted. Plaintiffs stated at oral argument that they are continuing their investigation and can now plead additional facts. Consequently, plaintiffs will be given one more chance to plead allegations sufficient to withstand a motion to dismiss under the current law. They may file a second consolidated amended complaint within thirty days.