## In re The VANTIVE CORPORATION SECURITIES LITIGATION.

**Glenn R. Fischer; Brian Fischer; Joshua Rizack, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**The Vantive Corporation; John R. Luongo; John M. Jack; Kathleen A. Murphy; Christopher W. Lochhead; Roger J. Sippl; David J. Jodoin; Michael J. Loo, Defendants–Appellees.**

No. 00–16136.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 2001.

Filed March 15, 2002.

William S. Lerach and Eric A. Isaacson, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, for the plaintiffs-appellants.

Shirli Fabbri Weiss, Gray, Cary, Ware & Freidenrich, LLP, San Diego, CA, for the defendants-appellees.

Before: CANBY, HAWKINS and GOULD, Circuit Judges.

## OPINION

CANBY, Circuit Judge.

The issue before us is whether the complaint in this securities fraud class action states a claim under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u 4(b)(1), (2). The district court held that it did not, and dismissed the complaint without leave to amend. The plaintiffs appeal, and we affirm.

### *Background*[1]

This action is brought under §§ 10(b) and 20(a) of the Securities Exchange Act

---

1. We take our factual summary largely from the district court's opinion. *In re Vantive Corp. Sec. Litig.,* 110 F.Supp.2d 1209 (N.D.Cal.2000).

of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5. The plaintiffs allege violations of the Act and Rule on behalf of a class of investors who bought Vantive stock between April 23, 1997 and July 6, 1998 (the "class period"). The defendants are the Vantive Corporation and certain of its officers and directors. We summarize the facts from the complaint, and assume these facts to be true for the purposes of our decision.

Vantive sold and serviced customer relationship management software (called "front-office software") that enabled field personnel to deliver customer service across many channels, including the Internet, a call center, or in person. Vantive made its initial public offering in August 1995 at $6 per share. Enjoying rapid sales and earnings growth, Vantive's stock price increased to more than $35 per share by late 1996. In April 1997 (the beginning of the class period), however, Vantive's stock price dropped to $14 per share as two competitors announced disappointing results; many believed that this particular software sector had peaked.

The plaintiffs allege that, beginning in April 1997, the defendants made knowingly false and misleading statements about the competitive prospects of Vantive's products and the growth of Vantive's sales force, and falsely forecast increased revenues for 1998 and 1999. The plaintiffs also allege that the individual defendants caused Vantive to manipulate and falsify its publicly reported financial results by prematurely recognizing millions of dollars in revenues for software licensed to resellers even though the resellers were not obligated to pay for those licenses until they sublicensed the product to the end user. Allegedly as a result of these misrepresentations, Vantive's stock rose to $39. During the class period, Vantive allegedly acquired two other firms by issu-

ing 874,000 shares of its common stock and selling $60 million in debt securities to raise capital. Also during the class period, the individual defendants sold 1.39 million shares of their Vantive stock at prices as high as $31 per share, for a total of roughly $36 million in insider trading proceeds.

On July 6, 1998, Vantive revealed that its results for the 1998 second quarter would be worse than earlier forecast, that Vantive was appointing a new head of North American sales, and that it was going to reduce the size of its direct sales force. Analysts slashed the 1998 revenue and earnings per share forecast for Vantive. Vantive's stock fell to as low as $11 per share and performed poorly thereafter. Unable to compete successfully as an independent company, Vantive was sold to the Peoplesoft Company in October 1999.

On July 6, 1999, one year after the end of the alleged class period, shareholders filed three virtually identical complaints against Vantive and the individual defendants. After these cases were consolidated, and the plaintiffs filed a third amended complaint, the district court granted the defendants' motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). The district court concluded that the plaintiffs had failed to meet the heightened pleading requirements of the PSLRA. The court denied the plaintiffs leave to amend.

### Discussion

The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter. *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001). The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to

the practice of pleading "fraud by hindsight."[2] *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir.1999). A securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,[3] the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete. *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1005–06 (9th Cir. 2002). Further, the complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). Thus the complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B)(i); *see Ronconi*, 253 F.3d at 429; *Silicon Graphics*, 183 F.3d at 985.

In this case, the plaintiffs allege that, over the course of a sixty-three week period, the defendants: 1) knowingly made false and misleading statements about Vantive's ability to sell its products, 2) knowingly made false and misleading

statements concerning the quality of its products, 3) manipulated Vantive's financial results, and 4) falsely forecast future revenues. In support of these allegations, the plaintiffs also allege that the individual defendants engaged in suspicious insider trading and corporate transactions. As we discuss below, these allegations do not meet the requirements of the PSLRA because they are not sufficiently particularized and do not raise a "strong inference" that misleading statements were made knowingly or with deliberate recklessness to investors. *Ronconi*, 253 F.3d at 429.

Most of the complaint is premised upon Vantive's July 1998 press release announcing "lower then expected" earnings. Starting from this announcement, the plaintiffs speculate in hindsight that earlier projections made throughout the prior fifteen months must have been false for failure to disclose adverse facts. The complaint does not allege contemporaneous facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged statements. *See Ronconi*, 253 F.3d at 432. Indeed, the bulk of the alleged adverse facts are generic, subjective, difficult to prove or refute, and could be alleged against almost any company that has experienced a drop in sales revenue. The 102 page complaint rarely, if ever, sets forth a particularized basis to support the existence of these "concealed facts."

---

**2.** *See, e.g., DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990) ("The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud.").

**3.** Allegations are deemed to have been made on information and belief until the plaintiffs demonstrate that they have personal knowledge of the facts. *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C 99–00109, 2000 WL 1727377, at *12 (N.D.Cal. Sept.29, 2000). In this case, the plaintiffs have failed to demonstrate personal knowledge of the facts, and thus we treat their pleadings as having been made on information and belief.

## I. Sufficiency of the Allegations of Deception

### A. Statements Concerning Vantive's Ability to Sell Its Products

The plaintiffs first allege that Vantive deliberately misled investors with respect to its ability to sell its products. The complaint asserts that, throughout the class period,[4] the Vantive defendants continually stated that the growth and performance of its direct sales force was "on plan," when, in fact, Vantive: 1) "was unable to hire sufficient numbers of qualified persons to grow its direct salesforce at the rate necessary to sustain the level of revenue growth being forecast"; 2) was "unable to adequately train its new direct sales persons"; and 3) was "plagued with very high salesforce turnover." Consequently, the complaint alleges, the sales force was not adequately positioned to meet Vantive's projected sales goals.

The plaintiffs also allege that Vantive misleadingly touted its "extremely strong executive and sales management teams" as being a "key competitive advantage" to its ability to sell and grow Vantive's business, when in fact, Vantive "was suffering serious problems" with its management teams, who "were distracted" and "unable to effectively manage" because of "continual disagreements and in-fighting." The plaintiffs also label as a misrepresentation the defendants' statement that "Vantive's sales cycle was holding steady at 3–6 months," because Vantive's sales cycles were actually "lengthening substantially." Finally, the plaintiffs allege, Vantive misrepresented that it "had very successful growth in its indirect distribution channels," because in reality "Vantive was not successfully expanding its indirect sales channels with new partnerships with HBO, Learning International, EDS or Lucent, as each of these resellers were [sic], in fact, encountering significant difficulties in sublicensing Vantive's ... products, due to the lack of differentiation and the technological problems with those products."[5]

 We hardly need elaborate on the inadequacy of these generalized allegations under the heightened pleading standard of the PSLRA. *See generally Ronconi,* 253 F.3d at 423; *Silicon Graphics,* 183 F.3d at 970. Their deficiency is that they fail to plead falsity or scienter with particularity. For example, although the complaint alleges that over the fifteen-month class period, Vantive continually and deliberately misled investors by stating that its sales-cycle was "*holding steady at three to six months,*" much of the complaint fails to allege any facts to indicate why this statement would have been misleading at the several points at which it was alleged to have been made. Even when the complaint eventually indicates that "Vantive's sales cycles were lengthening substantially," the complaint gives no indication of what it means for a sales cycle to lengthen "substantially," or what the actual length of the cycle was at the time of the statement.

Along similar lines, the complaint leaves unclear what it would mean for Vantive to "adequately train" an employee, what "sufficient numbers" of hirees would be, or what it means for "a substantial percent-

---

**4.** The complaint repeats the defendants' alleged misrepresentations at several places throughout the complaint (with some slight variations) to reflect that the defendants continued to make the same misrepresentations throughout the class period. For purposes of the analysis here, we need not consider these slight variations individually.

**5.** This contention is belied by statistics provided later in the complaint, which indicate that Vantive's indirect sales revenues jumped from 17% of total sales revenues in 1996 to 36% by the third quarter of 1997.

age" of people to quit. Nor does the complaint indicate how these facts would necessarily show that Vantive's statement that its hiring was "on plan" was misleading and deliberately reckless at the time it was made.[6] The complaint also does not indicate what it means for a management team to be "extremely strong," what the "continual" disagreements that supposedly "plagued" the managerial team consisted of, or why such disagreements would make it misleading for the company to have characterized its management as being "strong." Cf. Ronconi, 253 F.3d at 432 (complaint inadequate for failing to state what alleged "significant" or "difficult" problems were, for failing to state what kind of "inefficiencies" existed, and for failing to identify an amount of "cost excesses" or "lack of revenue growth" or state how these inefficiencies showed that two companies were not consolidated). In the absence of greater particularity, "we have no way of distinguishing [the plaintiffs'] allegations from the countless 'fishing expeditions' which the PSLRA was designed to deter."[7] Silicon Graphics, 183 F.3d at 988.

The other major problem with these allegations is that they do not adequately establish that the defendants had knowledge of the supposedly "true but concealed" circumstances concerning Vantive's problems in selling its products. The plaintiffs attempt to establish such

knowledge by adverting to the defendants' "hands-on" management style, their "interaction with other corporate officers and employees, their attendance at management and board meetings, and reports generated on a weekly and monthly basis in the Finance Department (under Murphy)." These reports included " 'license revenue reports,' 'service revenue reports,' 'contract revenue reports,' and reports that listed potential sales and the probability that the contract would be signed by the end of a given quarter, ... [and] financial reports comparing Vantive's *actual* financial results to *projected* results."

These allegations are insufficient in light of our decision in Silicon Graphics, 183 F.3d at 985. There, we rejected a plaintiff's attempt to establish that defendant insiders had knowledge of alleged production and sales problems through general allegations that the defendants had received internal reports, including daily reports, monthly financial reports, "Stop Ship" reports, and "Flash Reports." Id. at 984 & n. 14, 985, 988. We stated that, if a plaintiff is to rely on the existence of reports as a means of establishing knowledge, she must "include adequate corroborating details," such as the "sources of her information with respect to the reports, how she learned of the reports, who drafted them, ... which officers received them," and "an adequate description of

---

6. The complaint does not indicate what time frame the defendants were referring to when they stated that their sales force hiring goals were on target. Notably, however, the original complaint appears to suggest that Vantive actually met its projected goals for the year 1997. *Compare* complaint ¶ 40 ("management has indicated that they do not foresee any issues with attaining its targeted 80–90 salespeople by [the end of 1997])" *with* ¶ 57 (estimating that Vantive ended 1997 with a sales force of 80).

7. In a few instances, the plaintiffs do include more specific facts to support their allegations. These facts, however, do not show that statements were misleading when made. For example, that Vantive gave employees $2,500 when successfully referring new hires to Vantive's sales force does not necessarily indicate that Vantive knew it could not meet its hiring goals. Cf. Ronconi, 253 F.3d at 432 (allegations failed to create an inference of fraud where statement not necessarily inconsistent with underlying true facts). The same is true of the allegation that Vantive's sales force turnover exceeded 25%.

their contents." *Id.* at 985. The reason for requiring such detail was that "every sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts," and that allowing a plaintiff "to go forward with a case based on general allegations of 'negative internal reports' would expose all those companies to securities litigation whenever their stock prices dropped." *Id.* at 988.

As in *Silicon Graphics*, the plaintiffs here have failed to include corroborating details of the internal reports. Indeed, the plaintiffs have failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports. The allegations are similarly deficient, for the same reasons, with respect to the defendants' attendance at meetings and their "hands-on" managerial style.

### B. Statements Concerning the Marketability of Vantive's Products

■ The plaintiffs allege that Vantive deliberately misled investors with respect to the marketability of its products. These allegations suffer from many of the same deficiencies as those discussed above. The complaint asserts that, throughout the class period, the Vantive defendants continually stated that Vantive "experienced good demand for its Vantive Enterprise/Sales product in the U.S." and that its "products were differentiated from competitors' products by their high quality and superior functionality." According to the complaint, these statements were misleading because "Vantive's [core] products were not substantially differentiated from the products of its competitors and did not have superior functionality or technological features ... resulting in slow sales of these products." There are no further

allegations to indicate what "slow sales" were, or what is meant by the statements that Vantive products were not "substantially differentiated" or "superior" to those of a competitor. And there are no facts alleged to show why the defendants would know that their representations were false or misleading if they were so.

Similar deficiencies inhere in the complaint's allegations that the defendants lied when representing that Vantive "was successfully developing/had successfully introduced Vantive Sales (Version 7) for release." [8] There are simply no details in the allegations that would make these representations false—allegations that Vantive Version 7 "was not well received by customers, was known to be a 'disaster' inside the Company, as several of its software modules did not work properly" that deployment of the product resulted in "serious problems" for Vantive sales operations, "requiring the investment of significant management resources ... to cure these operational problems" and that Vantive 7 was "not commercially viable due to defects in the product." Nor are any corroborating facts alleged, or sources stated, for the allegation that Luongo "secretly ordered" that Vantive 7 not be sold and that it be used as a pilot product until Vantive 7.5 could be introduced.

Equally indefinite are the allegations supposedly rendering false the representations of the Vantive defendants that Vantive "was successfully competing in the salesforce automation market." According to the complaint, this statement was misleading because "Vantive's salesforce automation products ... all suffered from technological and performance shortcomings compared to competitive products." Vantive's automation products used an

---

8. According to ¶ 66 of the complaint, the Vantive defendants had stated that they had "successfully shipped" Version 7; in ¶¶ 80 & 90 of the complaint Vantive had "successfully introduced" Version 7; and in ¶ 95, Version 7 had been "released" and "was successful."

SQL "remote interface" that was "much less architecturally flexible" than the SQL "anywhere interface." This put Vantive at a "significant competitive disadvantage, especially to Siebel in the salesforce automation market," and resulted in "customers refusing to place large orders for these products after pilot programs and increasingly refusing to even accept these products on a test or pilot basis." It also meant that "Siebel beat Vantive in virtually every major salesforce automation contract." The vagueness of these allegations needs no elaboration; there are no facts alleged to show how the imprecise deficiencies asserted to hamper the product affected Vantive's competitive position, what a "major contract" was, or whether the result rendered Vantive non-competitive in fact. And, once again, there is a total absence of factual allegations that would permit a strong inference that the defendants knew that their representations were false or misleading when made, if they were so, or that the defendants acted in deliberately reckless disregard of their truth or falsity. Without any corroborating facts, it is impossible to conclude that such allegations rest on more than hind-sight speculation. *Cf. Silicon Graphics,* 183 F.3d at 988.

### C. Vantive's Alleged Accounting Manipulations

The plaintiffs further alleged that Vantive engaged in accounting manipulations that allowed Vantive to inflate its revenues artificially. These allegations also fail to meet the pleading standard under the PSLRA.

### a. The EDS Contract

■ The plaintiffs' first allegation is that Vantive misled investors in the Second Quarter of 1997 when it said that it "had signed a $19 million deal with EDS— which would generate revenue for Vantive through year end 98 and likely millions in follow-on revenue after that." According to the complaint, this statement was misleading because "Vantive had no basis to represent that the contract would be worth $19 million," since the "Statement of Work" section stated only, 'To be determined.' The complaint further alleges that, "[a]s part of the secret side deals made with EDS in the [4th Quarter of 1997], Vantive knew that the revenues from the EDS reseller contract would not total $19 million but, in fact, the revenues would total materially less.".

A number of problems cripple this allegation. First, the complaint fails to allege how much money Vantive ultimately recognized on the EDS contract.[9] Without this allegation, it is difficult to find a "strong inference" that Vantive deliberately misled investors, because it is fully possible that Vantive eventually *did* recognize $19 million on the contract. In fact, the complaint hints at this possibility by indicating that Vantive had recognized $13.6 million on the contract through the first quarter of 1998. Second, the allegation includes no facts showing why an incomplete statement of work would necessarily mean that Vantive had no basis to say that the contract was worth $19 million. *Cf. Ronconi,* 253 F.3d at 432–33 (rejecting an allegation that a statement was misleading at the time made when a certain fact was not necessarily inconsistent with the defendant's statement). Under the PSLRA, the

---

**9.** The complaint merely indicates that in July of 1998, Vantive told analysts that they had expected "more from EDS which did not materialize." But this allegation does not indicate that Vantive did not realize the full $19 million on the contract, or indicate that Vantive's $19 million estimate was deliberately misleading at the time it was made.

plaintiffs bear the burden of specifying "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Finally, the complaint fails to allege when the "secret agreement" was entered or why it made the earlier statements knowingly false or deliberately reckless when made.

### b. "Secret Change" in Revenue Recognition Policy

■ The plaintiffs next allege that Vantive "secretly" changed its revenue recognition policies for its reseller arrangements sometime during its 1997 fiscal year. According to the complaint, Vantive began to account for its revenues from indirect sales in a much more "aggressive" fashion than it previously had done, prematurely recognizing millions in revenues by recording revenue on software licenses to resellers even though the resellers were not obligated to pay for those licenses until they sublicensed the product to the ultimate consumer. The result, according to the complaint, was that Vantive's indirect sales' figures were inflated, marked by a jump in indirect sales revenues from 17% of total sales revenues in 1996 to 36% by the third quarter of 1997.[10]

The plaintiffs' conclusion rests upon a comparison of Vantive's pre–1998 description of its revenue recognition policy on reseller contracts and its later description of the policy on March 25, 1998. Prior to March 1998, Vantive described its revenue recognition policy as follows: "Sublicense fees are *generally* recognized as reported by the reseller in relicensing the Company's products to end users." In its Form 10–K filed on March 25, 1998, Vantive continued to describe its revenue recognition policy using language identical to that quoted above, although it added a description of how revenues were recognized when the general policy was not followed:

> In certain circumstances, sublicense fees are recognized upon the initial sale if all products subject to sublicensing are shipped in the current period, no rights of return policy exits [sic], collection is probable, payment is due within one year, and fee is fixed or determinable [sic]. If these conditions are not met, the Company does not recognize sublicense fees until reported by the reseller in re-licensing the Company's products to end-users.

As the district court properly observed, a major problem with the plaintiffs' allegation here is that the 1998 language did not necessarily represent a change in policy. The earlier language did not represent that Vantive *always* recognized revenues upon relicensing, but rather that it *generally* did so.

Even more significantly, the complaint fails to allege facts making the challenged revenue-recognition practice fraudulent or misleading. The fact that a buyer ultimately may return some goods does not preclude all recognition of revenues from sales to that buyer at the time they are made. *See Malone v. Microdyne Corp.,* 26 F.3d 471, 477 & n. 8 (4th Cir.1994). Although the complaint, in addition to the EDS allegation, alleges that Vantive induced its distributors HBO and Licensing International to accept "millions of dollars of excessive software licenses" for resale by promising them that they did not have to pay for them unless resales occurred,

---

**10.** Earlier in the complaint, the plaintiffs allege that Vantive's 1997 statements that indirect sales figures were growing were false and misleading at the time made. That indirect sales figures went from 17% of 36% of total sales, while overall revenues increased greatly, weakens the strength of these earlier allegations, because this fact suggests that Vantive's 1997 statements that indirect sales figures were growing were true at the time made.

it fails to allege specific contemporaneous conditions known to the defendants that would strongly suggest that the defendants understood that their recognition of revenues on "millions of dollars of software" was "excessive"—i.e., that such recognition would result in overstated revenues. *Cf. Malone*, 26 F.3d at 477. Finally, there is no sufficient allegation of the amounts by which revenues were allegedly overstated. *Cf. Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir. 1999) (noting that a "basic detail" in an accounting fraud allegation is the "approximate amount by which revenues and earnings were overstated."). Indeed, although the complaint alleges that revenues were improperly accelerated from 1998 to 1997, the graph provided by the plaintiffs indicates that indirect sales revenues in 1998 exceeded those of 1997, an unlikely outcome if revenues had been improperly accelerated. Nor are the allegations of improper recognition of revenues aided by allegations that Vantive "secretly" entered into meetings with various distributors, because these allegations contain no specifics or corroborating details of time, persons, places, and subjects. *Cf. Silicon Graphics*, 183 F.3d at 985 (allegations that there were meetings at which directors entered into a "conspiracy of silence" insufficient without corroborating details).

■ Because scienter has not been adequately alleged, we need not dwell on the question whether falsity has been pled with particularity here, although we are convinced that it has not. The plaintiffs rely on *Cooper v. Pickett*, 137 F.3d 616 (9th Cir.1998), to support their allegations of fraud as sufficient. But *Cooper* was decided under the law as it existed prior to

the PSLRA, and applied only the particularity requirements of Fed.R.Civ.P. 9(b) for the allegations of fraud.[11] *See id.* at 628 n. 2. The PSLRA, however, imposes stricter pleading requirements. For example, prior to the PSLRA, scienter could be alleged generally. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir.1994); *Ronconi*, 253 F.3d at 429 n. 6. Under the PSLRA, of course, the plaintiffs are required to allege in detail facts giving rise to a strong inference of scienter. *Silicon Graphics*, 183 F.3d at 974. The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts," and the two requirements may be combined into a unitary inquiry under the PSLRA. *Ronconi*, 253 F.3d at 429. These stricter standards have not been met by the complaint's allegations of financial manipulation.

### D. Vantive's Financial Forecasts

■ In addition to the alleged misrepresentations discussed above, the plaintiffs allege that Vantive lied to investors when making financial forecasts throughout the class period. Because these forecasts are unquestionably forward-looking statements, the plaintiffs must have alleged facts that would create a strong inference that the defendants made the forecasts with "actual knowledge ... that the statement[s were] false or misleading" at the time made. 15 U.S.C. § 78u–5(c)(1)(B)(i).

The basis for this allegation of the plaintiffs is that, because the defendants were aware of the problems discussed above, the defendants knew that their forecasts

---

11. The complaint in this case does not even meet the standards of *Cooper*. In *Cooper,* we held that a complaint met the particularity requirement of Rule. 9(b) in part because it alleged that the defendant company had inflated its revenues by "specific amounts" listed in the complaint. *Id.* at 627; *see also id.* at 626. There is no such allegation here.

could not possibly be accurate. This allegation is deficient because, as we have just demonstrated, the alleged problems upon which this allegation relies have themselves not been pleaded successfully. There are no facts alleged to show that the defendants knew their forecasts were false when made.

## II. Stock Sales & Corporate Transactions

 The plaintiffs next focus on the defendants' stock sales and Vantive's corporate transactions as an alternative basis for showing that the plaintiffs deliberately misled investors when making the representations alleged above. Insider stock sales are not inherently suspicious; they become so only when the level of trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi*, 253 F.3d at 435. Among the relevant factors to consider in making this determination are: "1) the amount and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history." *Id.* (internal quotation and citation omitted). Context is important, especially for assessing the weight to attach to the timing of the sales. *See Greebel*, 194 F.3d at 206.

### A. Defendants' Stock Sales

The plaintiffs allege that the defendants collectively sold 1,398,191 shares of stock totaling $36,383,386 in proceeds over the fifteen-month class period, amounting to an aggregate sale of 38% of the defendants' holdings.[12] The district court determined that, although these figures represented a "substantial" amount of trading, the allegations failed to raise a strong inference of fraud. Having examined the specific circumstances of each of the defendants' stock sales alleged in the complaint, and the circumstances of the defendants' stock sales overall, we agree with the district court.

Before we examine the individual defendants' sales, we point out some overarching considerations. First, the plaintiffs have selected an unusually long class period of sixty-three weeks. *Cf. Silicon Graphics*, 183 F.3d at 985 (alleging a class period of 15 weeks); *Ronconi*, 253 F.3d at 428–31 (alleging a class period of thirty weeks). It is obvious why they have done so; it is not because the allegations found elsewhere in the complaint support an inference of fraud throughout the class period, but because lengthening the class period has allowed the plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period. The class period begins in April 1997. As we have already pointed out, however, the allegations of misrepresentation in 1997 (including allegations that 1998 revenues were accelerated into 1997) are woefully inadequate, and Vantive met its earning projections for 1997. If the class period had begun in December 1997 instead of April 1997, the defendants' aggregate stock sales would plummet from $36 million to approximately $11 million, and their stock sales would hardly be "dramatically out of line with prior trading practices," *Ronconi*, 253 F.3d at 435; the defendants' aggregate sales in the preceding seven months would have exceeded the sales during the class period.

---

12. The individual defendants' stock options have been included in computing these percentages. As *Silicon Graphics* noted, "[a]ctual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone." *Silicon Graphics,* 183 F.3d at 986–87.

Second, we have upheld dismissals of complaints that alleged stock sales considerably larger than those alleged here. In *Ronconi*, for example, we affirmed the dismissal of a complaint that alleged that seven of eleven insider defendants had sold 69% or more of their shares and options, and an eighth defendant had sold 98% of her total shares, over a considerably shorter class period than the class period alleged here. *Id.* at 435–36. Similarly, in *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989), we upheld summary judgment to defendants where it was undisputed that the defendants had sold $84 million in stock sales over a ten-month period. These cases reveal that, by themselves, large numbers do not necessarily create a strong inference of fraud.

Third, we observe that the insufficient allegations of fraud elsewhere in the complaint have a spillover effect here. It is true that in our prior decisions we have severed our discussion of stock sales from other allegations in the relevant complaints. *See Ronconi*, 253 F.3d at 434; *Silicon Graphics*, 183 F.3d at 985–86. But stock sales are helpful only in demonstrating that certain statements were misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements. In this case, the class period alleged is so long, and the virtually identical allegations recycled throughout the complaint so many times, that it becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with deliberate recklessness at the times they were made. This fact operates to the detriment of the plaintiffs, because it is their burden under the PSLRA to provide a clear context from which we can find a strong inference of fraud. *See Silicon Graphics*, 183 F.3d at 974.

We now turn to the individual defendants' stock sales.

### 1. Chairman Roger Sippl

▮ Chairman Roger Sippl's stock sales were the largest among the defendants, both in terms of percentage and amount. Sippl sold 74% of his holdings over the fifteen-month class period, for a total of approximately $19 million—over half of the defendants' total of $36 million in sales. While these sales were clearly suspicious in amount, they were not suspicious in timing and do not appear to have been "calculated to maximize the personal benefit from undisclosed inside information." *Ronconi*, 253 F.3d at 435.

Twelve million of Sippl's nineteen million dollars in sales occurred in the *first month* of the fifteen-month class period, starting late April 1997, well over a year before the July 1998 press release upon which the plaintiffs largely base their lawsuit. During this first month, no defendant other than Sippl sold a single share of stock, nor did any other defendant sell a single share for an additional two months after Sippl had finished selling the $12 million in stock. Had Sippl been selling these shares to "dump" what he knew was artificially inflated stock, other equally (or more) knowledgeable defendants presumably would have done the same thing. *Cf. id.* at 436 ("One insider's … sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made."). Creating further doubt that Sippl was operating on "inside knowledge" at this time is the fact that he sold the overwhelming majority of shares for between $20 and $24 per share, when the price of the stock continued to increase in the several

months following these sales, and ultimately peaked at $39. *Cf. id.* at 435 (noting that there is no strong inference of scienter when insiders "miss the boat" by selling at share prices between $53 and $56, when the share price ultimately rises to $73).

Sippl's remaining $7 million in sales do not substantially support an inference of fraud either. Because the complaint gives no reason to conclude that Sippl's sale of $12 million in stock in May of 1997 was anything but valid, Sippl's $7 million in sales over the course of the final fourteen months of the class period were not inconsistent with Sippl's prior trading history. *See id.* at 435. The overwhelming majority of Sippl's remaining sales occurred in November 1997, when the price of stocks hovered at approximately $25 per share— again below a price at which Sippl could be seen to have maximized the value of alleged inside knowledge. *See id.* Three of the six other defendants did not sell any stock during the month of November 1997, nor did they sell any during the two months before and after November 1997.[13] Finally, Sippl is not alleged to have uttered a word, or have participated in preparing statements, during the entire class period. *Cf. Silicon Graphics*, 183 F.3d at 987–88 (insider's failure to utter any of the allegedly false statements helped dispel an inference of fraud that the plaintiffs asserted flowed from that insider's stock sales).

There accordingly is no basis for finding circumstantial evidence of fraud in Sippl's stock sales. If his sales are excluded, the defendants' aggregate sales drop considerably, from $36 million to $17 million.

---

**13.** Three other defendants did sell during the month of November. These defendants, however, did not sell stock in alarmingly large amounts, nor for suspiciously high prices.

### 2. Chief Executive Officer John Luongo

■ Chief Executive Officer John Luongo sold only 13% of his total number of shares and vested options over the course of a fifteen-month period. Under our precedent, this figure is not suspicious, and does not support a strong inference of fraud. *See Ronconi*, 253 F.3d at 435 (holding that a defendant's sale of 17% of his shares and options over a thirty-week period was not suspicious). Indeed, rather than supporting an inference of fraud, Luongo's sales tend to negate such an inference. In his position as CEO and as the person most quoted in the complaint, Luongo was presumably in the best position to know the "true" facts. Yet his trading percentage belies any intent to rid himself of a substantial portion of his holdings.

### 3. Executive Vice President Charles Lochhead

■ Defendant Charles Lochhead, an Executive Vice President of Vantive, sold 26% of his shares and vested options during the fifteen-month class period, for approximately $900,000. We do not find this amount or percentage to be terribly "unusual" or suspicious, given the complaint's failure to connect Lochhead's sales with any particular allegedly misleading statements.

The unusually long class period inflates Lochhead's purchases. It is not inherently alarming or unusual that an insider might sell a quarter of his holdings over the course of fifteen months, particularly in a volatile industry. *Cf. id.* (insider's sale of 17% of his shares over seven months not deemed suspicious); *see also* Jordan Eth & Michael Dicke, *Insider Stock Sales in*

---

Rather, they sold stock for share prices between $22 and $25, well below the stock's peak price of $39–3/4.

*Rule 10B–5 Corporate Disclosure Cases: Separating the Innocent from the Suspicious,* 1 Stan. J.L. Bus. & Fin. 97, 97 (1994) (noting that it is not unusual for insiders to sell their stock frequently).

Lochhead's heaviest trading activity came during one week in February 1998, when he sold approximately half of the shares he would ultimately sell during the entire class period. The price of stock during this time was $25 per share. Shortly after making these sales, the price of stock per share steadily increased, and ultimately peaked at approximately $40. Consequently, Lochhead's relatively modest sales were not "calculated to maximize the personal benefit from undisclosed inside information." *Ronconi,* 253 F.3d at 435.

### 4. Chief Financial Officer Kathleen Murphy

■ Chief Financial Officer Kathleen Murphy sold 32% of her shares and vested options, for proceeds of $1.6 million over the class period. Her sales were neither "dramatically out of line with prior trading practices," nor "calculated to maximize the personal benefit from undisclosed inside information," and thus they do not support a strong inference of scienter. *Id.* The amount is sufficiently substantial, however, that we will consider the other circumstances of her trading.

Murphy resigned from her position with the company in May 1998. Murphy's sale in February took place when the price of stock was $25 per share. That the price per share of stock steadily increased for the next several months, and peaked at a price of approximately $40, greatly weakens the inference that Murphy was seeking to take advantage of artificially inflated stock prices in February.

Murphy's sales during the class period were not "dramatically out of line" with her prior trading practices. During the fifteen-month class period, Murphy sold approximately 61,000 shares of stock for $1.6 million. *Id.* In the nine months immediately preceding the class period, Murphy sold 10,000 shares stock for proceeds totaling approximately $400,000. Unable to find anything unusual about her trading pattern, or particularly suspicious about the timing or amount of her stock sales, we attribute little weight to Murphy's stock sales.

### 5. Executive Vice President David Jodoin

■ Executive Vice–President David Jodoin sold 48% of his holdings during the class period, for approximately $3.3 million. Because Jodoin joined Vantive four months into the class period, he has no relevant trading history. When a complaint fails to provide us with a meaningful trading history for purposes of comparison, we have been reluctant to attribute significance to the defendant's stock sales, even when the percentages of stock sold by an insider were far more suspicious than the percentage of stock sold by Jodoin. In *Silicon Graphics,* for example, we held that an insider who traded 75.3% of his holdings over a fifteen-week period had not engaged in suspicious trading. *Silicon Graphics,* 183 F.3d at 987–88. The reason for our conclusion was that the insider "was legally forbidden to trade" for a significant period before his alleged trading, so that he could have no significant trading history for purposes of comparison. *Id.* at 987. Because of a similar lack of trading history, we refused in *Ronconi* to conclude that a defendant who sold 98% of her total shares over the class period had engaged in suspicious trading. *Ronconi,* 253 F.3d at 435–36. Because Jodoin had no trading history, we cannot conclude that his trades were out of line with his past practice.

Jodoin's sales were not otherwise suspicious. A large portion of Jodoin's sales occurred when the stock was approximately $25 per share; it later increased to $40 per share, and did not substantially decrease in value for many months following his sales. Moreover, Jodoin did not make any of the allegedly misleading statements, which *Silicon Graphics* noted weakens an inference of fraud. 183 F.3d at 988.

### 6. Chief Operating Officer John Jack

██ Potentially the most significant of the defendants' stock sales were those by Chief Operating Officer John Jack. Jack sold 55% of his shares for $3.5 million during the class period. That amount was substantially out of line with his prior trading practices, as he had sold only $700,000 in stock in the fifteen months preceding the class period. Nonetheless, in the context of this case, we are unable to conclude that his stock sales create a strong inference of fraud.

Jack made three sales over the course of the class period. One sale of $1.2 million occurred in July 1997, a period when Vantive's earnings were meeting targets and for which the allegations of misrepresentation were particularly deficient. These facts weaken any inference of fraud that might otherwise flow from Jack's July 1997 sale.

There is also insufficient context from which we could conclude that Jack's second and largest sale, in November 1997, was probative of fraud. He sold his shares at a price of $22 per share, when the price of Vantive stock would not drop significantly below that price for the next six months, and would, in fact, almost double in value over the course of the next several months. The timing of this sale therefore does not admit a reasonable inference that Jack was "dumping" shares that he knew to have been artificially inflated, and thus

his second sale is of no assistance to the plaintiffs.

That leaves only Jack's final sale in May of 1998. We need not dwell on this sale, however, because the complaint has given us no good reason to view Jack's first two transactions as having been suspicious. Jack's May 1998 sale, for $1.2 million, was not out of keeping with his unsuspicious trading history earlier in the class period.

### 7. Vice President Michael Loo

██ The last of the defendants, Vice President Michael Loo, sold 49% of his shares and vested options, for $1.4 million, over the fifteen-month class period. Loo is not alleged to have made any statements, and his sales amount to less than 4% of the total sales with which the plaintiffs are concerned. In light of the fact that the other defendants' sales are not particularly suspicious, and that other factors further mitigate the suspiciousness of Loo's sales, Loo's relatively insignificant trading activity alone does not give rise to a strong inference of fraud. *Cf. Silicon Graphics*, 183 F.3d at 987–88 (fact that defendant sold only 5% of shares with which plaintiff was concerned, and that another did not make any of the alleged misstatements, weakened an inference of fraud).

### B. Corporate Transactions

██ The plaintiffs next argue that corporate transactions by Vantive during the class period also help to create a strong inference of scienter. As with the stock sales, these transactions have diminished potential value for the plaintiffs because of the weakness of the complaint's underlying allegations of falsity or scienter. The complaint first alleges that Vantive made two corporate acquisitions in August 1997 and June 1998, using 874,000 shares of Vantive stock as the principal source of payment.

According to the complaint, the defendants inflated the value of Vantive's stock so that Vantive would be able to issue fewer shares for the acquisitions, which would thereby prevent dilution of current shareholders' ownership of Vantive.

This alleged fact has insufficient probative value. First, this allegation would have Jodoin (who was CEO of the company acquired in the first acquisition) defrauding himself.[14] In addition, this allegation fails to provide any approximation of how much "dilution" the defendants' alleged misrepresentations prevented. Although the allegation indicates that 874,000 shares were used to fund the acquisitions, the complaint gives no indication of how many shares would have been issued absent the alleged misrepresentations, what the *total* number of shares at Vantive were, or how much stock each defendant stood to gain by making such representations. In light of these difficulties and the weakness of the plaintiffs' underlying allegations, the corporate acquisitions fail to bolster the plaintiffs' case.

The plaintiffs also allege that Vantive used "subordinated notes" to raise $60 million, and that the need to raise these funds created a motive to inflate the value of the stock, leading to a strong inference of fraud. The plaintiffs are correct that a desire to raise company financing can be probative of a motive to defraud investors, *see Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir.2000), but such a fact alone does not make a case. *Howard* established only that a desire to raise company financing, *combined with* the "red flags" of a company's financial condition, can be sufficient to withstand summary judgment. *See id.* Here, the other "red flags" have not been sufficiently alleged. Moreover, *Howard* noted that it was not

applying the more stringent pleading standard under the PSLRA and *Silicon Graphics, see id.*, and so what was sufficient to avoid summary judgment in *Howard* is not necessarily sufficient to avoid a motion to dismiss under the PSLRA. In light of the weakness of the complaint's primary allegations, the bare sale of notes is not sufficient to raise a strong inference of fraud.

In summary, then, neither the corporate transactions nor the insider stock sales are sufficient to save the complaint, in light of the total deficiency of the allegations of knowing falsehood or deliberate recklessness at the time statements were made. The complaint fails to state a securities violation under the pleading standard of the PSLRA.

### III. Leave to Amend

■ The district court dismissed the complaint with prejudice. We conclude that the district court did not abuse its discretion in failing to provide an opportunity to amend the complaint. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1295 (9th Cir.2000) (noting abuse of discretion standard when reviewing denials to grant leave to amend a complaint).

■ Leave to amend need not be granted when an amendment would be futile. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir.1998). In this case, the plaintiffs had three opportunities to plead their best possible case. It was therefore not unreasonable for the district court to conclude that it would be pointless to give the plaintiffs yet another chance to amend. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir.1990) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff

---

14. Under the plaintiffs' allegations, Jodoin would have been defrauded because he would have received artificially inflated shares in

Vantive stock at the time his company was acquired.

has previously amended the complaint."). When given the opportunity, the plaintiffs declined to say what additional facts they might plead if given the chance to amend.[15] Such a failure is a strong indication that the plaintiffs have no additional facts to plead. *See Silicon Graphics*, 183 F.3d at 991 (denying leave to amend where plaintiff failed to offer additional facts which might cure defects in complaint); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.1993) (same). There was no abuse of discretion.

### Conclusion

Unfortunately for the plaintiffs, their case is founded upon exactly the kind of complaint that the PSLRA is aimed at. The district court did not err in ruling that the complaint failed to state a claim under the pleading standards of that Act. The judgment of the district court is

**AFFIRMED.**

---

**15. The Court:** Can't you answer my question? It's easy to say yes or no. Do you have the contemporary documents, e-mails, conversations, memoranda contradicting the defendant's challenged statements? You may not have them that's why you didn't put them in.

**[Counsel]:** What we have alleged in the complaint, if that answers your question....
**The Court:** That's not enough ...
**[Counsel]:** Well, I think what we do allege is enough.