**In re LOCKHEED MARTIN CORP. SECURITIES LITIGATION**

**No. CV 99–00372 MRP.**

United States District Court,
C.D. California.

March 24, 2003.

William S. Lerach, Randall J. Brown, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, for Plaintiff.

B. Boyd Hight, Seth Aronson, Patrick N. Downes, Amy J. Longo, O'Melveny & Myers, LLP, Los Angeles, CA, for Defendants.

## MEMORANDUM OF DECISION AND ORDER RE:

1. **Motion for to Dismiss Plaintiffs' Consolidated Third Amended Complaint**
2. **Request for Judicial Notice**
3. **Motion to Strike Portions of Plaintiffs' Consolidated Third Amended Class Action Complaint**

PFAELZER, District Judge.

## I. Background

### A. Factual Background

This is a class action brought on behalf of purchasers of Lockheed Martin Corpo-

ration ("Lockheed" or "Company") stock between August 13, 1998 and December 23, 1998 (the "Class Period"), against Lockheed and six of its officers and directors. The individual defendants and their alleged positions during the Class Period are as follows:

Vance Coffman: CEO, Chairman of Board of Directors, and member of Executive Committee.

Marcus Bennett: Executive Vice President, Chief Financial Officer, and director.

James Blackwell: Vice President of Lockheed and Chief Operating Officer ("COO") of Lockheed's Aeronautics Sector.

Thomas Corcoran: Vice President of Lockheed and COO of Lockheed's Space and Strategic Missiles Sector.

Norman Augustine: director and member of the Executive and Finance Committees of Lockheed.

Vincent Marafino: director and member of the Audit and Ethics and Finance Committees of Lockheed.[1]

(Consolidated Third Amended Complaint, September 13, 2002, ¶ 28 ("CTAC" or "Complaint").)

Assuming the truth of Plaintiffs' allegations, *see Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 998 (9th Cir.2002), the facts in this case are: beginning with an August 13, 1998 conference call with market professionals, Lockheed announced that it expected to sign a significant F–16 order with the United Arab Emirates ("UAE") by year-end 1998. The contract was anticipated to be for 80 F–16s, each equipped with "Block 60" technology, which included advanced electronic warfare systems with full software codes and extra large fuel tanks that substantially increase the flying range of the aircraft. (CTAC ¶ 73.)

At about the same time, the Company assured shareholders and analysts that its C–130J airplane program was poised for success and that the Company expected to deliver its first 25–30 C–130Js to the United States Air Force ("USAF") during the third and fourth quarter of 1998, to be followed by robust deliveries of these planes going forward. (CTAC ¶ 47.)

Based in large part on these anticipated successes, Lockheed expressed publicly during the Class Period that it anticipated strong third and fourth quarter 1998 results and that Lockheed would have 10% Earnings Per Share ("EPS") growth in the fourth quarter and for 1998. On December 23, 1998, however, Lockheed publicly disclosed that it would be unable to meet its prior forecast. Instead, Lockheed announced that its fourth quarter 1998 EPS would be at least 10% lower than its fourth quarter 1997 EPS and that 1998 revenues would be flat compared with 1997 revenues. Responding to the news, Lockheed share prices dropped from $95–3/4 to $82 per share.

Plaintiffs' core theory is that both the F–16 and C–130J forecasts were, when made, known to be false or misleading and that these statements artificially inflated Lockheed's share price during the class period. With respect to the F–16 statements, Plaintiffs conclude that Defendants must have known them to be false or misleading when made because of the UAE's insistence on obtaining the Block 60 technology. "Much of the technology was not currently being used by the USAF or Israel and would not enter the U.S. arsenal for at least five years." (CTAC ¶ 73.) Moreover, attempts by Saudi Ara-

1. Each individual defendant will be referred to as an Individual Defendant. The Individual Defendants and Lockheed will collectively be referred to as the Defendants.

bia and Egypt to purchase F–15 jet fighters with similar technology had been denied by the Pentagon. Thus, transfer of the technology to the UAE in the near term was "extremely unlikely." (CTAC ¶ 74.) Further complicating the situation is that the F–16 contract would have also required prior Congressional approval. According to Plaintiffs, Lockheed knew from its experience that "Pentagon and Congressional approval would normally take 6–8 months," thereby making the five month projection (from August 1998 to December 1998) overly ambitious and unrealistic.

Similarly, Plaintiffs allege that throughout the Class Period, Defendants knew that Lockheed would not and could not deliver any, let alone 30, C–130J airplanes in 1998. (CTAC ¶ 57.) In support of this allegation, Plaintiffs proffer statements from a former Lockheed flight engineer who worked on the C–130J throughout 1998 and who had responsibility for assuring compliance with all required certifications. According to the engineer, as of August 1998, the FAA certification (required by the USAF contract) had not been granted and the C–130J deliveries "had slipped by over 18 months." (CTAC ¶ 65.) Moreover, Lockheed was still, in late 1998, flight testing various models of the C–130J; this testing was required to "certify" that each C–130J complied with performance and reliability specifications. Finally, each C–130J aircraft was required to pass a functional test, referred to as "squawking out" the plane. Lockheed allegedly knew that individual aircraft had not been "squawked out" by late 1998 and that "more than 30 C–130Js could not be operationally tested, evaluated, qualified, and 'squawked out' by the third or fourth quarter of 1998." (CTAC ¶ 67.)

According to the Complaint, Defendants had ample motive to deceive the investing public. First, Lockheed wished to acquire COMSAT, a commercial satellite company, using a combination of cash and common stock as consideration. To preserve the value of the acquisition to the participants, Defendants needed to maintain Lockheed's share prices at previous levels. Second, Defendants wanted to maintain a high share price to discourage what they perceived as a takeover threat by certain foreign defense contractors. Finally, the Individual Defendants had personal pecuniary interests in maintaining Lockheed share price. They allegedly took advantage of the false expectations to sell 268,659 shares of Lockheed shares at an aggregate of over $28 million (CTAC ¶ 23) and were also motivated by their compensation structure to generate strong financial results by whatever means possible (CTAC ¶¶ 124–125).

Based on these allegations, Plaintiffs allege that the Defendants have each violated § 10(b) and Rule 10b–5 of the Securities and Exchange Act of 1934 and that the Individual Defendants have each violated § 20(a) of the Securities and Exchange Act of 1934.

**B. Procedural Background**

Plaintiffs have now filed three complaints in this action. On October 3, 2000, the Court dismissed the initial complaint, but granted Plaintiffs leave to amend with respect to certain allegations. Plaintiffs filed a Consolidated Second Amended Complaint ("CSAC") on December 15, 2000, which was again dismissed on July 22, 2002. *See* Mem. of Dec. re: Def.'s Mot. to Dismiss Pl.'s Cons.Sec. Amended Class Action Compl., July 22, 2002 ("July 2002 Order").

The July 2002 Order granted Plaintiffs leave to amend with respect to four broad issues. First, Plaintiffs were granted leave to amend to allege how the executive committee was involved in Lockheed's day-to-day operations during the Class Pe-

riod, if at all, and how the defendants Augustine and Marafino each participated in these operations. *See* July 2002 Order at 7. Second, Plaintiffs were granted leave to amend to include facts indicating that Augustine, Marafino, Corcoran, and Blackwell were directly involved in the preparation of the allegedly misleading statements. *See* July 2002 Order at 12. Third, Plaintiffs were granted leave to amend to show that the Defendants actually knew that the allegedly misleading statements regarding the F–16 contract were false or misleading when made. *See id.* at 15. Finally, with respect to the C–130J forecasts, Plaintiffs were granted leave to amend the complaint 1) to demonstrate that the anonymous "engineers" and "Lockheed employees" described in paragraph 47 of the CSAC were in positions to gain personal knowledge regarding the facts attributed to them, 2) to disclose the basis for Plaintiffs' knowledge regarding the statements by Parrish and the briefing by Bullock, and 3) to plead facts indicating that Defendants actually knew that the statements regarding the C–130J program were false or misleading when made. *See id.* at 21–22. Leave to amend with respect to the LM21 program and the satellite launches was denied. Plaintiffs filed their Consolidated Third Amended Complaint on September 13, 2002.

The following motions, all submitted by Lockheed, are before the Court: Motion to Dismiss Plaintiffs' Consolidated Third Amended Class Action Complain, Request for Judicial Notice, and Motion to Strike Portions of Plaintiffs' Consolidated Third Amended Class Action Complaint. For the reasons set forth below, the Motion to Dismiss is GRANTED and the Consolidated Third Amended Complaint is hereby dismissed in its entirety with prejudice. The Motion to Strike and the Request for Judicial Notice are DENIED because the granting of the Motion to Dismiss renders moot the issues set forth in those papers.

## II. Legal Standard

The Motion to Dismiss is governed by the Private Securities Litigation Reform Act of 1995 ("PSYLLA"), 15 U.S.C. §§ 78u–4, 78u–5 et seq. (1997), which Congress enacted to deter abusive and frivolous securities fraud claims. *See In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 973 (9th Cir.1999). The PSYLLA requires that a complaint plead with particularity both falsity and scienter. *Ronconi v. Larkin*, 253 F.3d 423, 429 n. 6 (9th Cir.2001). Thus, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1).

As to the scienter requirement, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* Generally, the required scienter is "deliberate or conscious recklessness" and mere motive and opportunity are insufficient. *Silicon Graphics,* 183 F.3d at 979. However, forward-looking statements [2] are protected if either of the following is true: 1) the forward-looking statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" or are immaterial, 15 U.S.C. § 78u–5(c)(1)(A) or 2), the "plaintiff fails to prove that the forward-looking

2. A forward-looking statement means, among other things, a statement containing a projection of revenues, income (including income loss), earnings and a statement of the plans and objectives of management, and a statement of future economic performance. 15 U.S.C. § 78u–5(i)(1)(A)–(C).

statement was made with actual knowledge ... that the statement was false or misleading," 15 U.S.C. § 78u–5(c)(1)(B). Thus, for forward-looking statements, Plaintiffs must state with particularity facts giving rise to a strong inference of actual knowledge.

In considering a motion to dismiss, the Court considers "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness," and not merely whether each individual allegation is sufficient. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir.2002). In so doing, the Court takes into account "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002). If the allegations could equally and plausibly support an inference showing the absence of fraud, then Plaintiffs have not met their burden. *See id.* at 896–97.

## III. Discussion

### A. Forward-Looking Statements

Preliminarily, the Court disagrees with Plaintiffs' contention that Defendant's statements regarding the C–130J and F–16 programs were not forward-looking statements. Although the Court has previously ruled that the statements are forward-looking statements as defined by the PSYLLA, 15 U.S.C. § 78u–5(c), Plaintiffs continue to argue that two factors take the statements outside of the safe-harbor. First, they argue that Lockheed did not provide the meaningful cautionary statements required by the PSYLLA. Second, they argue that Lockheed's statements were not forward-looking; rather they were premised on and concerned the then-current success of the Company. Neither argument withstands scrutiny.

The Court rejects the position that because Lockheed did not make meaningful cautionary statements, the statements fall outside the safe-harbor. Assuming, *arguendo*, that meaningful cautionary statements were lacking, the PSLRA protects forward-looking statements if they *either* are accompanied by meaningful cautionary statements or were made without actual knowledge that the statements were false or misleading. *See, e.g., In re Splash Tech. Holdings Secs. Litig.*, 160 F.Supp.2d 1059, 1069 (N.D.Cal.2001); *In re Boeing Sec. Litig.*, 40 F.Supp.2d 1160, 1167 (W.D.Wash.1998); *In re Amylin Pharm., Inc. Sec. Litig.*, 2002 WL 31520051, *8–9, 2002 U.S. Dist. LEXIS 19481, *23–25 (S.D.Cal.2002).

Plaintiffs also argue that although a promise to sign a contract for 80 F–16s, for example, might appear to be forward-looking, it is in fact, necessarily based on certain facts being *currently* true. Thus, a forecast with respect to future contracts for F–16s signals to the public facts relating to the current status of the F–16 program such as the fact that the F–16 is an actual plane that exists and that Lockheed is in or plans to engage in negotiations with others. As these statements depend on present facts and allow the investing public to infer such present facts, Plaintiffs argue that they are not entitled to the protection accorded forward-looking statements by the PSLRA.

While the Court agrees that statements based on current fact are actionable, it is unwilling to stretch that principle into one in which predictions of future events become actionable merely because they happen to have some basis in present facts.[3]

3. Plaintiffs' observation that Lockheed's statements about the future had an immediate effect of driving up the market price of Lockheed stock is of no legal or logical moment. Under almost any established theory of the

To accept Plaintiffs' position would be to carelessly intermingle the two related—but analytically distinct—issues of whether 1) a statement is forward-looking and 2) if so, whether the forward-looking statement is nevertheless actionable because the speaker knew that the statement was false or misleading when he made it. For example, Plaintiffs cite *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F.Supp.2d 955 (C.D.Cal.2000), for the proposition that the statement at issue in that case was "not forward-looking because it was undermined by the factual omissions that the preliminary contract had not been signed." (Opp'n. at 6.) In so doing, Plaintiffs imply that if a plaintiff merely provides vague allegations that there were omissions, the protections for forward-looking statements do not apply.

This position reflects the law neither of the Ninth Circuit nor of *2TheMart.com. See In re Clorox Co. Secs. Litig.*, 238 F.Supp.2d 1139, 1145 (N.D.Cal.2002) ("Here, the relevant statement was forward-looking. Rose was estimating the time it would take for Clorox to clear out the excess inventory. Although her statement was based on existing knowledge, it was quite clearly a prediction of future events."). Instead, the proper analysis is to begin by determining whether a statement is forward-looking. If the statements are forward-looking, the burden is then on Plaintiffs to show that Defendants had actual knowledge that the statements were false or misleading. *See* 15 U.S.C. § 78u–5(c)(1)(B). Plaintiffs, in asking first whether there were omissions, and then asking whether the statement is forward-looking, put the proverbial cart before the horse. To accept Plaintiffs' position would be to discard a statutory framework that provides protection for forward-looking statements, replacing it instead with the notion that mere allegations of omission, not even rising to the level of actual knowledge, would make such statements actionable.

Here, the Court proceeds by first asking whether the statements speak of future or contingent events. To this question, the Court answers, "yes." The focus then becomes whether the statements are nonetheless actionable because of actual knowledge of the false or misleading nature of the statements at the time they were made. It is to this second issue that the Court now turns its attention.

**B. F–16 Contract**

■ In the July 2002 Order, the Court acknowledged that Plaintiffs had pled facts raising a specter that the statements regarding the F–16s were misleading. *See* July 2002 Order at 13. However, since the statements regarding the F–16 contract are forward-looking, Plaintiffs must demonstrate that Defendants actually knew that the forward-looking statements were false or misleading when they were made and must plead facts sufficient to establish such knowledge in order to survive a motion to dismiss. *See In re Splash Tech. Holdings Secs. Litig.*, 160 F.Supp.2d at 1069. Although Plaintiffs had repeatedly failed to plead facts sufficient to demon-

market, the price of a company's stock reflects certain expectations about the future condition of the company. *See, generally,* Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency,* 70 Va. L.Rev. 549, 561 (1984) (noting that securities prices ultimately turn on expectations about future earnings). Hence, the fact that the stock price changes immediately does not, by logic, imply that the statement was about the current condition of the company. Indeed, if the stock price never adjusted for statements about the future of the company, then the protection for forward-looking statements would be irrelevant since no investor would ever be able to show damages based on forward-looking statements.

strate Defendants' knowledge, the Court granted leave to "amend the complaint to show that the Defendants actually knew that the allegedly misleading statements were false when made." July 2002 Order at 15. The CTAC incorporates few changes to the F–16 allegations, and the changes that have been made are clearly insufficient to meet the PSLRA's requirements.

Preliminarily, the allegations are legally insufficient because Plaintiffs' allegations about why Defendants had actual knowledge of the alleged facts are based solely upon conjecture. Plaintiffs attribute the knowledge not to any inside sources, documentation, or available public information; rather, Lockheed is claimed to have knowledge of the alleged facts because of its position as "the primary contractor for the manufacture of the F–16 fighter aircraft," (CTAC ¶ 73), and because "Boeing's F–15 was a major competitor to Lockheed's F–16," (CTAC ¶ 74). If these types of logical inferences and generalizations were sufficient to meet the PSLRA's requirements, plaintiffs could *effectively* manufacture support in any case to overcome the PSLRA's requirements.

In any event, Plaintiffs' allegations suffer from another shortcoming. Although Plaintiffs continue to allege that numerous sources of information existed that demonstrate the false or misleading nature of the F–16 statements, they muster facts sufficient only to allege that a portion of this information was known to Lockheed. Even if the Court were inclined to agree that this entire latter set of information was actually known to Lockheed, the Court would still find that information insufficient to demonstrate that Lockheed knew that its statements were false or misleading when made.

The items of information that Plaintiffs actually claim were known by Lockheed show only that the Block 60 technology was cutting-edge, not that Defendants knew that the United States would not allow sale of such technology to the UAE. That the United States would not have the technology for five years can be attributed to the advanced nature of the technology; but it can equally be attributed to budgetary constraints, a lack of faith in the technology, or simply bureaucratic red tape. Plaintiffs plead no facts that persuade the Court to prefer one inference to another. Nor does the Pentagon's denial of Boeing's request to sell similar technology to Saudi Arabia and Egypt serve to indicate that Defendants knew the false or misleading nature of their statements. The F–15 and F–16 are entirely different aircrafts with presumably different capabilities and intended uses. Under any circumstance, the Court would be wont to accept such a tenuous chain of reasoning from the Plaintiffs; the reasons for rejecting such reasoning are enhanced where, as here, the heightened pleading requirements of the PSLRA apply.

**C. C–130J Contract**

In the July 2002 Order, the Court dismissed all allegations with respect to the C–130J because Plaintiffs failed to allege that Defendants actually knew that the statements regarding the C–130J program were false or misleading when made. Like the F–16 pleadings in the CTAC, Plaintiffs' pleadings in the CTAC with respect to the C–130J remain insufficient under the PSLRA because they fail to properly demonstrate that facts known to Lockheed made the statements false or misleading when made.

A recurrent theme in the C–130J evidence proffered by Plaintiffs is not what the allegations say, but what has (presumably) been carefully filtered out. For example, Plaintiffs allege that as of August 1998, FAA certification had not been

granted; they do not say that as of August 1998, Lockheed knew that certification would not be granted by year end. Moreover, the C–130J deliveries "had slipped by over 18 months," but Plaintiffs do not allege what was the original delivery date. Are Plaintiffs alleging that the original target date was December 1998 and that the 18 month delay would put the target delivery date at June 2000? Or perhaps the initial date was June 1997, and the 18 month delay would mean delivery on December 1998?

Allegations that individual aircraft had not been "squawked out" by late 1998 are equally ambivalent. Plaintiffs do not allege either the total number of C–130Js in production at the time, or the total number of C–130Js that had not been "squawked out" by late 1998. Thus, Plaintiffs' allegations are entirely consistent with a scenario in which Lockheed was building 35 airplanes, five of which had not been "squawked out." This hypothetical scenario would, of course, do nothing to prove the actual falsity of the Lockheed statements regarding its ability to deliver 25–30 airplanes. Indeed, even if Lockheed had only 25 airplanes, none of which had been "squawked out" by "late 1998," nothing in the CTAC alleges that Lockheed knew that the "squawking" process for 25–30 airplanes could not be completed in the interim between "late 1998" and December 31, 1998; rather, the CTAC only alleges that "more than 30 C–130Js" could not be completed by December 31, 1998. (CTAC ¶ 67.) Since Lockheed is only alleged to have promised 25–30 airplanes, allegations with respect to "more than 30 C–130Js," even if true, would be irrelevant.

The remaining C–130J allegations in the CTAC suffer from similar defects. For example, although Plaintiffs allege that training infrastructures were not established until 1999, they do not allege that the establishment of such infrastructures was a condition to C–130J aircraft delivery. Further, allegations stemming from Gene Elmore's statement are insufficient:

> According to a June 17, 1998 Wall Street Journal article, Gene Elmore the C–130J line manager at Lockheed's Marietta plant told Coffman repeatedly in October and November of 1998 that seven C–130J airplanes were at "high risk" of missing the year-end delivery dates. This "high risk," however, was not disclosed to shareholders during the Class Period.

(CTAC ¶ 68.) The Court assumes that the article was actually printed in 1999, and not 1998. In either case, the allegation again does not show that Lockheed's statements were known to be false or misleading when they were made. Plaintiffs do not establish why Mr. Elmore believed the C–130Js were at "high risk" of missing delivery dates or whether Coffman (or any other members of Lockheed's senior management) agreed, or had reason to agree, with Mr. Elmore's assessment. *See, e.g., Nursing Home Pension Fund v. Oracle Corp.,* 242 F.Supp.2d 671, 681 (N.D.Cal. 2002) ("Providing the Court with information that Sanderson or Ellison had access to 'up to the minute' global roll-ups without providing what the details actually were cannot satisfy the pleading requirements of the PSLRA. Nor does the fact that these confidential witnesses, from their knowledge of the several regional, national, or global databases, thought that sales 'went dead,' 'fizzled out,' 'dried up,' and 'stopped' establish that Ellison, Sanderson or Henley knew of this information or thought the same thoughts."); *In re Nike, Inc. Sec. Litig.,* 181 F.Supp.2d 1160, 1168 (D.Or.2002).

Just as importantly, if the C–130J statements were made prior to October and November of 1998, Mr. Elmore's warnings

could not have made those earlier statements false or misleading when made.

With these large and unexplained gaps, the Court finds that Plaintiffs have not met their burden of alleging "with specificity that the defendants made false or misleading statements with deliberate or conscious recklessness." *See Lipton,* 284 F.3d at 1035.[4]

**D. Individual Defendants: Applicability of *America West***

The allegations against the Individual Defendants fail for two reasons. Initially, they fail because the pleading inadequacies fatal to Plaintiffs' claims against the Company are likewise fatal to the claims against the Individual Defendants because the latter derive from the same set of facts. Nothing in the Complaint suggests that any of the Individual Defendants had access to facts in addition to what is pled with respect to the Company's knowledge of the C–130J program (CTAC ¶¶ 47–71; 90–91) or the F–16 program (CTAC ¶¶ 72–77). As a threshold matter, then, Plaintiffs have failed to allege any facts suggesting that the Individual Defendants can be held liable.

The allegations also fail because Plaintiffs do not plead facts sufficient to support a strong inference of scienter on the part of the Individual Defendants. Although Plaintiffs had failed on two previous occasions to show scienter, they now contend that the amended pleadings, taken together with *No. 84 Employer–Teamster Joint Counsil Pension Trust Fund v. America West Holding Corp. et al.,* 320 F.3d 920 (9th Cir.2003) (*"America West"*), which was issued by the Ninth Circuit after the present Motion was filed, fortifies the CTAC against the PSLRA requirements.

**1. *America West***

The Court assumes familiarity with the *America West* case and will recite only those details necessary to address the questions here presented. In *America West,* the District Court "concluded that the stock sales by the officers, directors, and controlling shareholders were not suspicious and failed to raise a strong inference of scienter." *Id.* at 938. "[T]he District Court found it dispositive that none of the officers or directors [except one] who allegedly engaged in insider trading made any of the false or misleading statements." *Id.*

The Ninth Circuit Court of Appeals reversed. In so doing, it first stated that "[a]n insider's silence as to the statements is not dispositive." *Id.* "Rather, it is merely another factor that should be considered in determining whether a strong inference of scienter has been raised." *Id.* The Ninth Circuit then determined that the amount and percentage of shares sold, the timing, and the prior trading histories made the stock sales by the individual defendants there "unusual and suspicious" and enough to "give rise to a strong inference of scienter." *Id.* at 940.

The Ninth Circuit also held that plaintiffs had sufficiently alleged scienter with respect to the individual defendants' knowledge of the false or misleading nature of their statements. Although some of the defendants in *America West* argued that the issues regarding maintenance, safety, and the FAA investigation never rose to the level of Board discussions or communications with shareholders, the Ninth Circuit rejected the argument as "patently incredible." *Id.* at 943 n. 21. Considering that the FAA had indicated

4. Because Plaintiffs have failed to plead any facts demonstrating that there was any information that tends to show the statements with respect to the C–130J and F–16 were false or misleading when made, the Court need not and does not intimate any view on whether Plaintiffs have properly identified their sources.

penalties of up to $11 million and that the defendant company was contemplating repurchasing authorization for millions of dollars worth of stock, the Ninth Circuit found that the plaintiffs there had sufficiently raised a strong inference of deliberate recklessness. *Id.* at 943–44.

Plaintiffs argue that *America West* supports their Complaint in two essential aspects.[5] First, Plaintiffs argue that *America West* demonstrates that the Court committed error in calculating the percentage of shares that Defendants sold. Specifically, Plaintiffs allege that vested, but unexercised, options should not be included in calculating the percentage of shares sold, *see id.* at 936 n. 16, and that non-selling Defendants should not have been included in the calculations. Second, they argue that the Court required too much in the July 2002 Order when it found that the Plaintiffs had not demonstrated active involvement by certain Individual Defendants sufficient to infer that they had knowledge about the false or misleading nature of the statements at issue.

**2. Share Calculations**

*Silicon Graphics* and *America West* condone different approaches to determine the percentage of shares sold. In *Silicon Graphics,* the Ninth Circuit held that in determining the proper proportions of stock sales, the lower court did not err in taking into account vested but unexercised options:

> When evaluating stock sales, we have held that the proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious. In this case, we see no reason to distinguish vested stock options from shares because vested stock options can be converted easily to shares and sold immediately. Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone.

*Silicon Graphics,* 183 F.3d at 986–87. The *America West* court departs from the method used in *Silicon Graphics* by deriving its percentages using only the common stock and exercised options. *See America West,* 320 F.3d at 939 n. 16.

The differences in methodologies, however, do not support Plaintiffs' contention that the Court should not consider the vested but unexercised options. Neither *Silicon Graphics* nor *America West* state a rule mandating that vested options should or should not be included. Rather, the *Silicon Graphics* court pointed out that in most instances, it is more appropriate to take into account vested options because the occasions are rare where there is a true economic distinction between vested and unexercised options and exercised shares. The decision, however, left open the possibility that different situations might mandate different approaches. *See Silicon Graphics,* 183 F.3d at 986 ("*In this case,* we see no reason to distinguish ....") (emphasis added). While the *America West* court chose a different methodology, it did not repudiate the logic set forth in *Silicon Graphics.* In the absence of more guidance by the *America West* court, this Court can only speculate as to why *America West* deviated from *Silicon Graphics.*

There are, of course, many possible good reasons to do so. For example, the calculations in *America West* were provided by the plaintiffs, *America West,* 320 F.3d at 940, and it is conceivable that neither the defendants there nor the court chose to

5. Plaintiffs also argue that *America West* counsels that the mere fact that the people making the false or misleading statements did not also sell stock is not dispositive. *Id.* at 940. As the Court does not disagree with this point, no further discussion is warranted.

challenge that assumption. Alternatively, it may have been that the number of vested options in *America West* was so insignificant as to make the dispute academic. Finally, there may have been restrictions on the ability to exercise the options or to subsequently sell the issued shares such that the vested options did not fully represent the owner's trading potential. Each of these possibilities are, of course, persuasive reasons not to include vested options and the *America West* court's decision not to include vested options is not actually inconsistent with *Silicon Graphics.*

Ultimately, the weakness of Plaintiffs' position lies not in the law as set forth in *Silicon Graphics* or *America West.* The tension between the two cases is an illusory one and both cases leave room to ignore vested options where there is reason to do so. Rather, the weakness of Plaintiffs' position is that Plaintiffs do nothing to show that inclusion of vested options in this case distorts, rather than reflects, economic reality. Without more explanation in the *America West* opinion itself or by the parties, the Court is unwilling to read so much into the *America West* case as to assume that it lays down a new rule regarding vested options.

Similarly, the Court is unwilling, without more, to accept Plaintiffs' reading of *America West* as standing for the proposition that those who did not sell should not be included in the percentage calculations. The *America West* opinion included a chart that shows the percentage of shares sold by nine individual defendants. From this fact alone, Plaintiffs would have the Court infer that *America West* mandates a substantial departure from prior Ninth Circuit case law suggesting that non-selling insiders can be taken into account. *See, e.g., Lipton,* 284 F.3d at 1037; *Ronconi,* 253 F.3d at 436. As with the issue over unexercised options, the Court is unwilling to infer merely from the fact that the particular chart included in the opinion, without more, represents a mandate or authority for the Court to ignore those defendants that did not sell.

### 3. Inferring Actual Knowledge on Individual Defendants

Plaintiffs attempt to bolster their scienter claims against Augustine and Marafino by pointing to allegedly insider trading executed at suspicious times. " '[U]nusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter ...." *Silicon Graphics,* 183 F.3d at 986 (citation omitted). However, insider stock sales are only suspicious when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989)). "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citing *Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir. 1996)). "[L]arge numbers do not necessarily create a strong inference of fraud." *In re Vantive Corp. Secs. Litig.,* 283 F.3d 1079, 1093 (9th Cir.2002). Finally, "[o]ne insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." *Ronconi,* 253 F.3d at 436.

The July 2002 Order dismissed the allegations against both Marafino and Augustine because Plaintiffs had failed to allege that either was involved in the day-to-day operations of the Company. *See* July 2002 Order at 7. As noted in the July 2002

Order, by the beginning of the Class Period, "both Augustine and Marafino had retired from their positions as Lockheed executive officers." July 2002 Order at 5. While the CSAC alleged that Augustine and Marafino served as board members and members of the Executive Committee, the Court concluded that the "duties of an ordinary board member generally do not include participation in executive activities." *Id.* at 5. "Similarly, asserting that the men are members of Lockheed's executive committee, without describing the duties of the committee or how these defendants participated in it, does not demonstrate active involvement in day-to-day operations." *Id.* The July 2002 Order gave Plaintiffs leave to amend solely with respect to whether Augustine and Marafino maintained involvement in day-to-day Company operations.

In the CTAC, Plaintiffs in part continue on the discredited strategy of focusing on Marafino's and Augustine's duties prior to the Class Period. (CTAC ¶¶ 114, 117.) Reliance on pre-class period duties has already been rejected and merits no further discussion or consideration by the Court. *See id.* at 5 ("The additional facts pertaining to Marafino and Augustine refer almost exclusively to their pre-class period accomplishments and affiliations with the company. Plaintiffs must demonstrate day-to-day involvement during the Class Period—when the insider trading allegedly took place.") (citations omitted).

To the extent that the CTAC contains more detailed allegations with respect to the Class Period, such allegations are wholly conclusory and insufficient under *Silicon Graphics.* For example, Plaintiffs allege that as a member of the Finance Committee, Augustine "reviewed the financial condition of the Company, and reviewed and made recommendations regarding the Company's budget." (CTAC ¶ 116.) Further, Plaintiffs allege that Augustine had more active involvement with the Company than an ordinary director "due to his skill and knowledge of Lockheed's ongoing business and the industry." (CTAC ¶ 114.)

The allegations with respect to Marafino are pled with similar lack of detail. It is alleged that as a member of the Finance Committee, "Marafino received regular updates regarding the status of the Company's major projects" and that due to his various roles within the Company, "Marafino was well aware of the true states of affairs regarding the Company's C–130J deliveries, the F–16 contract negotiations with the UAE and third and fourth quarter 1998 financial results." (CTAC ¶ 118.)

The pleadings in the CTAC with respect to Augustine and Marafino clearly do not meet *Silicon Graphic's* mandate that Plaintiffs "state with particularity facts giving rise to a strong inference of the required state of mind, i.e., at least deliberate recklessness." *Silicon Graphics,* 183 F.3d at 985. Plaintiffs here have done no more than to "set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate [their] claim." *Id.* Contrary to *Silicon Graphics's* mandate that the Plaintiffs provide, for example, "sources of [their] information, with respect to the reports, how [they] learned of the reports, who drafted them, or which officers received them," *id.,* no source, anonymous or named, is cited in the CTAC to support either the existence or substance of these "regular updates." Moreover, Plaintiffs have apparently found no one willing to corroborate their allegations of extensive day-to-day involvement by Augustine and Marafino. Such "unsubstantiated internal reports alone are insufficient to demonstrate such recklessness." *Id.; Vantive,* 283 F.3d at 1087–88; *In re Guess? Inc. Secs. Litig.,* 174 F.Supp.2d 1067, 1076 (C.D.Cal.2001) ("The Court is provided no

information as to who drafted these reports, what date the key reports or statements were made, what specifically the reports contained, or any other corroborating details. This is insufficient pleading.") (citations omitted). To hold otherwise would be to vitiate the core requirements of the PSLRA.

*America West* does not mandate a different result. To the contrary, the *America West* court affirmed the principle that allegations with regard to "internal reports" must be accompanied by some "indicia of reliability." *America West,* 320 F.3d at 942 n. 20. The plaintiffs in *America West* went further than Plaintiffs here by identifying the person who directed the preparation of the reports. Even then, the court nevertheless found that that was not enough. Although the court noted that "requiring a plaintiff to provide specifics from the reports prior to discovery seems a bit unfair," the Court was nevertheless bound by precedent and therefore gave "the internal reports little or no weight" in its analysis. *America West,* 320 F.3d at 942 n. 20. In stark contrast, Plaintiffs here provide far less than the *America West* plaintiffs. The Court thus sees no alternative other than to apply the same "unfair" stringent standard here.[6] *See id.*

### E. Remaining Individual Defendants

In the July 2002 Order, the Court ruled that the Individual Defendants Augustine, Marafino, Corcoran, and Blackwell could not be held liable since only Coffman and Bennett were alleged to have made any of the statements at issue. In so doing, the Court found that the group-published information doctrine did not survive the enactment of the PSLRA. *See* July 2002 Order at 12. The CTAC alleges no new information to suggest that Augustine, Marafino, Corcoran, and Blackwell were directly involved in the preparation of the allegedly misleading statements and these defendants should thus be dismissed with prejudice.

With respect to Bennett and Coffman, the Court has previously dismissed all allegations except for those relating to reports prepared by analysts Cal Von Rumohr and Howard Rubel. These two remaining allegations have already been foregone by the Plaintiffs and thus warrant no further consideration. *See* July 2002 Order at 25 ("Plaintiffs do not allege in the Second Consolidated Amended Complaint that Defendants are liable for the reports of Von Rumohr and Rubel, or that such reports were false or misleading in any way. The new complaint appears to reference the reports only in the context of providing factual background for other allegations.").

Thus, none of the Individual Defendants can be held liable for statements by or to analysts.

6. The Court notes that neither party addresses another relevant distinction between *America West* and the case at hand. In *America West,* the "bad news" would have come from a source outside of the company—the Federal Aviation Administration ("FAA"). In its communications with the defendant company, it is most likely that the FAA communicated directly with senior management and/or the board. Additionally, while the FAA fine might have been ultimately appealable, the FAA communications would have left no dispute as to the amount of the initial assessment.

By contrast, much of the bad news here would have originally been discovered on the production floor and would have had to percolate up to management. Moreover, the workers in the production floor might not have access to the range of information necessary for accurate situation analysis. Such incomplete information might thus have led the production workers to 1) not report such perceived problems up the ladder or 2) to report those problems, and be reasonably ignored or overruled.

### F. Overall Analysis

Having found the individual allegations insufficient to satisfy the heightened pleading requirements, the Court also finds that the allegations taken as a whole are insufficient. At first glance, this case appears complicated. There are multiple defendants, different levels of selling by shareholders, and two different sets of statements alleged to be false or misleading. At the core, however, Plaintiffs' case must be based on the foundation that there existed information or reasons for the Defendants to believe that the F–16 and C–130J statements were false or misleading when made. Plaintiffs have failed the task of pleading such knowledge and, not surprisingly, the pleadings as a whole fail to present even a facade of the conscious wrongdoing required to survive the Motion to Dismiss.[7]

## IV. Conclusion

Plaintiffs for the third time have failed to satisfy the PSLRA's pleading requirements. Plaintiffs' entire case rests on the fact that the statements with respect to the C–130J and F–16 programs were known to be false or misleading when they were made. While Plaintiffs' allegations might have sufficed to give the Court a basis to infer that some wrongdoing occurred, the PSLRA requires much more. It requires the Court to examine all reasonable inferences, both favorable and unfavorable to the Plaintiffs' case. Applying that standard, it seems obvious that the facts pled here do not lead only to the inference that the Defendants knew the statements regarding the C–130J and F–16 were false when they made them; rather, examining both the individual allegations and the allegations as a whole, it appears that the Defendants made some forecasts in 1998 which, while aggressive, were nevertheless grounded in some realistic expectations.

Not all the expectations were borne out, and both Lockheed and its numerous investors suffered as a result. Congress, however, has made a determination that the losses suffered must be attributable to facts and circumstances alleged in accordance with the requirements of the PSLRA. The allegations here do not satisfy that standard.

For the reasons stated, Plaintiffs' suit is hereby DISMISSED. Because the Court believes that no further amendments could cure the defects fatal to the first three complaints, the dismissal shall be WITH PREJUDICE. *See Lipton,* 284 F.3d at 1038–39. The Motion to Strike and the Request for Judicial Notice are each DENIED.

IT IS SO ORDERED.

7. The dismissal of the Section 10 claims renders moot the Section 20(a) claims, since the latter requires that Plaintiffs establish a strong inference of a primary violation of the securities laws. *See Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir. 2000).